L. A. WALKER, III and LINDA J. WALKER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Walker v. Commissioner
Docket No. 44463-85
United States Tax Court
T.C. Memo 1990-609; 1990 Tax Ct. Memo LEXIS 691; 60 T.C.M. (CCH) 1340; T.C.M. (RIA) 90609; December 4, 1990, Filed *691 Decision will be entered for the respondent. Kenton E. McDonald, Farley Katz, and C. J. Muller, for the petitioners.
Joseph Craven, for the respondent. WRIGHT, Judge. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in petitioners' Federal income tax for taxable year 1979 of $ 226,943.74, and an addition to tax under section 6653(a)[1] for taxable year 1979 of $ 11,347.19. Respondent also determined that petitioners are liable for an increased rate of interest pursuant to section 6621(c) due to a substantial underpayment attributable to a tax motivated transaction. *693 The issues for decision are: (1) whether petitioners' claimed loss deductions from commodities future straddles are disallowed by section 108 of the Tax Reform Act of 1984, as amended by the Tax Reform Act of 1986; (2) whether petitioners' underpayment of tax is due to negligence or intentional disregard of rules and regulations, making petitioners liable for the addition to tax under section 6653(a); and (3) whether petitioners are liable for an increased rate of interest pursuant to section 6621(c) due to a substantial underpayment attributable to a tax motivated transaction. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, supplemental stipulation of facts, and accompanying exhibits are incorporated herein. Petitioners resided in Kingsville, Texas, when they filed their petition in this case. All references to petitioner are to L. A. Walker III. In 1970, petitioner became the principal owner of Buddy Walker Home Furnishings, Ltd. In its early years the business was profitable, but soon thereafter it began to operate at a loss. As business declined, petitioner began to trade actively in the stock market. By 1979, petitioner was devoting *694 a great deal of time to the short-term trading of stocks, stock options, and commodity futures. Commodity Futures Trading In General
A commodity futures contract is an agreement to deliver or to receive a specified quantity of a commodity during a specified month in the future at a specified price. A person who sells a commodity futures contract is obligated to deliver the commodity in the specified delivery month; this is referred to as taking a short position. A person who buys a commodity futures contract is obligated to accept delivery of the commodity in the specified delivery month; this is referred to as taking a long position. A commodity futures straddle involves simultaneously holding a long position in a commodity for one delivery month and a short position in the same commodity for a different delivery month. The long position and the short position are commonly referred to as the "legs" of the straddle. The term "spread" refers to the difference in price between the commodity *695 futures contracts for the two delivery months. Because a loss on one leg of a straddle is accompanied by a gain on the other leg, a straddle has less risk than an individual, or open, position. Petitioner's Commodity Futures Trading
Petitioner became acquainted with Robert William Van Deventer (Van Deventer) on a hunting trip. During all years relevant to this case Van Deventer was a commodities broker with Ray E. Friedman & Company Commodities (REFCO). Upon the recommendation of petitioner's stock broker that Van Deventer was skilled at making money for his clients through commodities futures trading, petitioner engaged Van Deventer to assist petitioner in trading commodity futures. By December 2, 1979, petitioner had deposited $ 100,000 with REFCO for the purpose of maintaining a margin for his account. Petitioner took positions in commodities futures contracts configured both as straddles and as open positions. During 1979, 1980, and 1981, petitioner closed commodity futures contracts as follows: Date
Date
1979
Acquired
Sold
Profit
Loss
5 Sept. T-Bills long
12-05-79
12-07-79
$  1,550
5 Dec. T-bills short
12-05-79
12-07-79
$ 3,200
5 Aug. Silver short
12-05-79
12-14-79
63,448
20 Aug. Silver short
12-07-79
12-14-79
270,180
5 March T-Bills short
12-05-79
12-14-79
13,825
5 Sept. T-Bills long
12-05-79
12-14-79
11,550
5 Sept. Gold short
11-14-79
12-14-79
36,175
10 Sept. Gold short
12-03-79
12-14-79
30,150
25 May Soybeans long
11-26-79
12-19-79
6,210
25 May Soybeans short
11-26-79
12-19-79
5,352
3 June Gold long
11-14-79
12-19-79
29,535
51,912
419,263
*696 Date
Date
1980
Acquired
Sold
Profit
Loss
5 April Silver short
12-14-79
01-02-80
199,847
5 June Silver long
12-05-79
01-02-80
265,977
5 July Wheat long
12-20-79
01-03-80
150
5 March GNHA long
11-14-79
01-04-80
3,349
5 Dec. GNHA short
11-14-79
01-04-80
5,401
5 March T-Bonds short
11-14-79
01-04-80
3,897
2 Dec. T-Bonds long
11-14-79
01-04-80
2,066
3 Dec. T-Bonds long
11-14-79
01-04-80
3,005
1 June T-Bill long
12-13-79
01-04-80
465
2 June Gold long
11-14-79
01-04-80
42,690
3 June Gold long
12-03-79
01-04-80
51,735
5 Dec. Gold short
12-04-79
01-04-80
83,775
7 June Gold long
12-03-79
01-07-80
142,415
3 Sept. Gold long
12-19-79
01-07-80
46,845
7 Dec. Gold short
12-14-79
01-07-80
140,385
3 Dec. Gold short
12-14-79
01-07-80
60,615
5 April Silver short
12-14-79
01-07-80
346,695
5 June Silver long
12-07-79
01-07-80
415,380
5 June Silver long
12-07-79
01-07-80
415,755
5 Aug. Silver short
12-19-79
01-07-80
286,995
15 April Silver short
12-14-79
01-15-80
1,098,667
10 June Silver long
12-07-79
01-15-80
870,510
4 June Silver long
12-19-79
01-15-80
245,204
15 June Silver long
12-19-79
01-15-80
921,015
14 Aug. Silver short
12-19-79
01-15-80
859,586
Silver Spread Adjustment
01-15-80
546
1 June Silver long
12-19-79
01-16-80
67,231
1 Aug. Silver short
12-19-79
01-16-80
67,410
Silver Spread Adjustment
01-16-80
39
1 March T-Bond short
11-14-79
01-17-80
455
1 Sept. T-Bond long
11-26-79
01-17-80
2,705
1 Dec. GNMA short
11-14-79
01-30-80
2,357
10 July Soybeans long
02-05-80
02-12-80
1,448
5 July Soybeans long
02-06-80
02-12-80
974
4 March Lumber short
12-19-79
02-12-80
2,800
1 March Lumber short
12-19-79
02-12-80
710
5 July Lumber long
12-19-79
02-12-80
2,300
3 March T-Bills long
02-08-80
02-20-80
11,430
2 March T-Bills long
02-08-80
02-20-80
7,670
5 March T-Bills short
02-08-80
02-20-80
22,950
3 June T-Bills long
02-22-80
02-22-80
3,678
1 Dec. GNMA short
11-14-79
02-25-80
10,107
2 June T-Bills long
02-14-80
03-03-80
9,020
2 June T-Bills short
02-14-80
03-03-80
4,530
3 Dec. GNMA short
11-14-79
03-04-80
28,915
10 Dec. GNMA short
11-26-79
03-04-80
127,635
5 March GNMA long
11-14-79
03-04-80
47,276
8 March GNMA long
11-26-79
03-04-80
100,392
9 Sept. T-Bonds long
11-26-79
03-04-80
138,922
5 Dec. T-Bonds long
11-14-79
03-04-80
61,554
4 March T-Bonds short
11-14-79
03-04-80
48,632
5 March T-Bonds short
11-26-79
03-04-80
72,352
5 March T-Bonds short
11-26-79
03-04-80
71,415
1 Sept. GNMA short
03-14-80
03-25-80
2,138
1 March GNMA long
11-26-79
03-25-80
12,580
1 March GNMA long
11-26-79
03-25-80
12,455
1 March T-Bond short
02-01-80
03-25-80
6,545
3,897,781
3,563,814
*697 Date
Date
1981
Acquired
Sold
Profit
Loss
1 July BN Meal long
03-27-81
03-31-81
704
1 May Lumber long
03-26-81
03-31-81
562
1 July Pork Belly short
03-18-81
04-14-81
5,350
5 July Wheat short
04-10-81
04-14-81
304
5 July Corn short
04-10-81
04-14-81
129
5 July Soybeans short
04-10-81
04-13-81
1,146
5 July BN Meal short
04-10-81
04-13-81
932
5,350
3,777
Silver Futures Contracts
On their 1979 Federal income tax return, petitioners reported short-term capital losses of $ 367,350 from trading various commodity futures contracts, all of which were disallowed by respondent. Of the $ 367,350 disallowed by respondent, $ 333,628 was directly attributable to the closing of 25 short contracts for August silver on December 14, 1979. The short August silver contracts initially acquired on December 5, 1979, as well as those acquired on December 7, 1979, were part of a straddle transaction in which petitioner also acquired long positions in 25 June silver contracts. On December 14, 1979, petitioner "switched" his June long, August short position for an April short, June long straddle position in an equal number *698 of silver contracts. This switch of positions resulted in a loss of $ 269,200 on the close of the 20 August contracts acquired on December 7, 1979, and $ 63,300 on the close of the August contracts acquired on December 5, 1979. Additional costs in the form of brokerage commissions incurred on the transactions resulted in a total loss on the close of the 20 August contracts acquired on December 7, 1979, of $ 270,180 and a total loss on the five August contracts acquired on December 5, 1979, of $ 63,448. Based on the movement of interest rates, the movement of commodities prices, and market expectations, it is possible to realize overall profits from balanced straddle positions of the type established by petitioner through the silver contracts acquired on December 5, 1979, and December 7, 1979. From December 5, 1979, the date petitioner entered into his first silver futures contract, through January 16, 1980, the date petitioner sold his final silver futures contract, petitioner realized a net, after-commission profit of $ 8,829 from trading in silver futures contracts. Overall, petitioner realized an economic loss on commodity futures transactions in 1979 and 1980 totaling $ *699 33,384. When petitioner closed out the loss legs of his silver futures straddle on December 14, 1979, creating a loss of $ 333,628, he was unaware of the profit inherent in the long legs. Short-Term Capital Gains
On June 18, 1979, petitioner purchased stock in Marathon Manufacturing. On December 4, 1979, petitioner sold the Marathon Manufacturing stock. As a result of the sale, petitioner realized a short-term capital gain of $ 307,825.66. During taxable year 1979, petitioner realized short-term trading gains in stocks and stock options in the total amount of $ 440,079.18. Petitioner realized $ 121,309.89 of the total amount of short-term capital gains prior to becoming involved in commodities trading. OPINION The primary issue in this case is whether petitioners are entitled to deduct losses on straddle transactions as claimed on their income tax return for 1979. Respondent does not argue that the transactions at issue were factual shams. Rather, respondent contends that the claimed deductions are not allowable due to section 108 of the Tax Reform Act of 1984, as amended by the Tax Reform Act of 1986. *700 Under section 108 of the Tax Reform Act of 1984 (section 108), as amended, losses from straddles are not deductible unless they are incurred in a trade or business or derived from transactions entered into for profit. Section 108 of the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630, as amended by section 1808(d) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2817-2818. In relevant part, section 108, as amended, provides: (a) General Rule. -- For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions -- (1) which were entered into before 1982 and form part of a straddle, and (2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply, any loss from such disposition shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business. (b) Loss Incurred in a Trade or Business. -- For purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as *701 a loss incurred in a trade or business. * * * (f) Commodities dealer. -- For purposes of this section, the term "commodities dealer" means any taxpayer who -- (1) at any time before January 1, 1982, was an individual described in section 1402(i)(2)(B) of the Internal Revenue Code of 1954 (as added by this subtitle) * * * Transactions Entered Into For Profit
Unless the losses are incurred in a trade or business, investors must prove that they entered into straddle transactions primarily for the purpose of obtaining an economic profit independent of tax savings in order to deduct related losses. Rule 142(a); Ewing v. Commissioner, 91 T.C. 396, 416 (1988); Boswell v. Commissioner, 91 T.C. 151, 158-159 (1988); Fox v. Commissioner, 82 T.C. 1001, 1019-1022 (1984).All of the objective facts relating to a taxpayer's straddle transaction, and not simply the facts relating to the loss legs, *702 must be considered in determining the taxpayer's primary motivation for entering the straddle transactions. Fox v. Commissioner, supra at 1018-1019. We find that petitioner has failed to prove that he entered into the transactions at issue here primarily for profit. The evidence introduced at trial consisted primarily of the testimony of petitioner and his commodity broker, Van Deventer. Petitioner testified that he never discussed the tax consequences of the straddle transactions with Van Deventer, and that he entered into the transactions primarily to earn a profit. However, Van Deventer's testimony failed to corroborate petitioner's testimony that the tax consequences were never discussed. We find it incredible that petitioner would enter into a transaction with such potentially favorable tax consequences without discussing the matter with his broker. We therefore do not accept petitioner's testimony that he was unfamiliar with the tax consequences of the transactions. Greater weight should be given to the objective facts than to petitioner's self-serving testimony regarding intent. Fox v. Commissioner, supra at 1022; Siegel v. Commissioner, 78 T.C. 659, 699 (1982). *703 We place little weight on petitioner's testimony, which was overly general, vague, and, for the most part, uncorroborated. We find it highly persuasive that his commodity futures activity coincided, at year's end, with the realization of a large short-term capital gain. Petitioner would be faced with a substantial tax due to his disposition of the Marathon Manufacturing stock, and was in need of short-term capital losses to offset the gains. While petitioner did engage in several relatively small commodity futures transactions after the close of 1979, the bulk of the acquisitions occurred at the end of his tax year. Petitioner offered no satisfactory explanation as to why the majority of his acquisitions took place during a two-month period. We also find it persuasive that petitioner "switched" from a June long, August short straddle to an April short, June long straddle when he closed 25 silver contracts on December 14, 1979. Such a transaction appears to us to be motivated by the desire to realize a loss upon closing the August contracts, while minimizing the size of any economic gain or loss on the overall transaction. Finally, we do not place great weight on the fact *704 that petitioner realized an overall gain of $ 8,829 from his silver futures trading activity. It is uncontested that the potential for profit exists in commodity straddle transactions like those engaged in by petitioner, as does the potential for an economic loss. However, the fact that there is a reasonable expectation of profit is not determinative. Ewing v. Commissioner, supra at 416.The relevant test is whether petitioner's primary purpose for entering the straddle transactions was for profit. For several reasons we find that, despite the profit of $ 8,829 petitioner realized on the silver straddle transactions, his primary purpose was not to earn a profit, but rather to create a loss for tax purposes. First we note that while petitioner realized an economic gain of $ 8,829 from trading in silver future contracts, he realized an overall loss on all commodity transactions of $ 33,384. Next, we note that on his 1979 Federal income tax return, petitioner claimed a loss of $ 333,628 attributable to the silver futures contracts which he closed on December 14, 1979. The profit on the silver contracts amounts to less than 3 percent of the loss petitioner *705 claimed on his tax return. The tax benefit of the straddle so far outweighs the economic profit that we cannot accept petitioner's contention that he was primarily motivated by the desire to earn a profit. Finally, we note that when petitioner closed out the short legs of his silver straddle on December 14, 1979, he was unaware of the gain inherent in the long legs. Had petitioner truly been motivated by the desire to earn a profit, he would have considered the amount of such gain prior to closing out the short legs. In conclusion, after an analysis of all of the evidence, we find that petitioner did not enter into the silver futures straddle primarily to earn a profit. We find that his motivation was to obtain a necessary short-term tax loss to offset his otherwise taxable gain on the disposition of his Marathon Manufacturing stock. We therefore sustain respondent's determination with respect to those transactions. Petitioners failed to present any evidence with respect to the nonsilver commodity futures contracts which they closed in 1979. We therefore sustain respondent's determination with respect to these contracts as well. Losses Incurred In a Trade or Business *706 Under section 108, a loss from the disposition of a position forming part of a straddle is allowable if the loss is incurred in a trade or business. Petitioner argues that during the year at issue he was in the trade or business of trading in securities and commodities, and therefore the losses at issue are allowable as deductions. Petitioner concedes that during the year at issue he was not a commodities dealer or a member of a syndicate. For persons who are not commodities dealers or members of a syndicate, it is a question of fact whether they are engaged in the business of trading commodities. Higgins v. Commissioner, 312 U.S. 212, 217 (1941); Liang v. Commissioner, 23 T.C. 1040, 1045 (1955). A person in the trade or business of trading securities generally buys and sells securities with reasonable frequency in an endeavor to catch the daily market swings and profit thereby on a short-term basis, as opposed to an investor who purchases securities for capital *707 appreciation and income, usually without regard to short-term developments that would influence the price of securities on the daily market. Moller v. United States, 721 F.2d 810 (Fed. Cir. 1983).A mere investor is not engaged in a trade or business by virtue of his holding of securities to produce income and capital appreciation. Groetzinger v. Commissioner, 82 T.C. 793, 800 (1984), affd. 771 F.2d 269 (7th Cir. 1985), affd. 480 U.S. 23 (1987).An active "trader," who looks to profit from short-term market swings and does not simply hold securities for long-term appreciation, may be deemed to be engaged in a trade or business provided that his trading is frequent and substantial. Groetzinger v. Commissioner, supra at 801.Petitioner bears the burden of proving that he was in the trade or business of trading commodity futures. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). We find that petitioner was not in the trade or business of trading commodity futures during 1979. First, we have already held that petitioner traded commodity futures primarily for tax, rather than *708 economic, benefits. Second, we find that petitioner's commodity futures transactions were not frequent or substantial. The 1979 transactions took place only during the last two months of the year. There were few purchases of futures during 1980, and fewer still during 1981. We find such sporadic trading inconsistent with petitioner's assertion that the activity amounted to a trade or business. We are not pursuaded by petitioner's argument that his securities and commodities transactions were short term. Commodity investments tend to be short term by nature. Because we find that petitioner's losses were not incurred in a trade or business as required by section 108, respondent's determination is sustained. Addition to Tax and Increased Interest
Addition to Tax Under Section 6653(a)
Section 6653(a) provides for an addition to tax equal to 5 percent of any underpayment if any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Negligence under section 6653(a) is the lack of due care or the failure to act as a reasonable person *709 would act under the same circumstances where there is a legal duty to act. Neely v. Commissioner, 85 T.C. 934, 947 (1985).Petitioner bears the burden of proving that no part of the underpayment for 1979 is due to negligence or intentional disregard of rules and regulations. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757 (1972). Petitioners did not introduce any evidence with respect to this issue at trial, nor did they address it in their brief. We therefore find that the entire underpayment is due to negligence or intentional disregard of rules and regulations. We therefore sustain respondent's determination as to this issue and hold that petitioners are liable for the addition to tax for negligence. Increased Interest Under Section 6621(c)
Respondent determined that petitioners are liable for increased interest on an underpayment attributable to a tax-motivated transaction as defined in section 6621(c). Section 6621(c) (formerly section 6621(d)) provides for an increase in the interest rate where there is a "substantial underpayment" *710 (an underpayment that exceeds $ 1,000) in any taxable year "attributable to 1 or more tax motivated transactions." Section 6621(c)(3) defines tax-motivated transactions to include "any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092)," and "any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period." Sec. 6621(c)(3)(A)(iii) and (iv). The positions taken by petitioner herein constitute offsetting positions within the meaning of section 1092(c)(2). The increased rate of interest is effective as to interest accruing after December 31, 1984 (the date of enactment of the original section 6621(d)), even though the tax-motivated transaction was entered into prior to that date and regardless of the date the return was filed. Solowiejczyk v. Commissioner, 85 T.C. 552, 556 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). We have found that the transactions at issue here were primarily tax-motivated transactions and not entered into for profit. Accordingly, we sustain respondent's *711 determination as to this issue and hold that the increased interest rate under section 6621(c) applies. In light of the foregoing, Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩