**Robert G. LESLIE and Marilyn B. Leslie, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent– Appellee.**

No. 96–70880.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 2, 1997.

Decided May 27, 1998.

Kevin M. McGuire, Law Offices of Federico Castelan Sayre, Newport Beach, California, for petitioners/appellants.

Laurie Snyder, United States Department of Justice, Tax Division, Washington, DC, for respondent/appellee.

Before: FERGUSON, THOMPSON, and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We examine the lingering federal income tax consequences of participation in gold-futures "straddle" transactions in the early 1980's, when the top tax-rate bracket was 70%.

## I

On their 1980, 1981, and 1982 federal income tax returns, Robert and Marilyn Leslie claimed gains and losses resulting from gold-futures "straddle" transactions that Robert entered into with futures commission merchant F.G. Hunter & Associates ("Hunter"). A futures contract, in a nutshell, is an agreement either to buy or to sell a specific quantity of a specific commodity during a designated month in the future. A contract—called a "position"—is "long" if it requires its holder to purchase the commodity, and "short" if it mandates a sale. For purposes relevant to this case, a "straddle" occurs when a single individual (in this instance, Robert) holds both (1) a long position requiring delivery in one month and (2) a short position in the same commodity requiring delivery in a different month. Each of the two positions constitutes a "leg" of the overall straddle transaction. A straddle leg is generally "closed out" by acquiring an offsetting position. *See Miller v. Commissioner*, 836 F.2d 1274, 1276 (10th Cir.1988).[1]

In 1980, the Leslies reported ordinary losses from Robert's straddle transactions in the amount of $1,530,268 and short term capital gains in the amount of $198,030. They also claimed as deductions $17,500 in fees paid to Hunter. In 1981, the Leslies reported ordi-nary losses in the amount of $55,302 and long term capital gains in the amount of $97,160. And in 1982, they reported long term capital gains from Hunter transactions in the amount of $1,172,950.

On February 20, 1987, the Commissioner of the Internal Revenue Service ("the Commissioner") issued to the Leslies a Notice of Deficiency, disallowing deductions of straddle losses totalling approximately $1.5 million for 1980, 1981, and 1982. A two-day trial was held in Los Angeles in early 1995. Finding that Robert's primary motivation in entering into the Hunter straddle transactions was to generate tax benefits, and not to realize profits, the Tax Court concluded that the losses incurred on the straddle transactions were not deductible. The court also rejected the Leslies' claim that they were entitled to a "net loss" deduction for 1982 in the amount that their straddle losses exceeded their straddle gains, denied their claimed deduction of fees paid to Hunter in setting up their straddle transactions, and imposed an enhanced-interest penalty of 120% of the rate otherwise payable on their tax underpayments.

The Leslies appealed, challenging each of the Tax Court's several conclusions. We have jurisdiction pursuant to 26 U.S.C. § 7482. We address of the Leslies' contentions in turn.[2]

## II

The central issue in this appeal is whether the Leslies are entitled to deduct losses on Robert's Hunter investments, as claimed on their 1980, 1981, and 1982 tax returns. The Deficit Reduction Act of 1984 ("DEFRA") permits the deduction of a loss sustained through participation in a pre–1982 tax straddle only "if such loss is incurred in a trade or business, or if such loss is incurred in a *transaction entered into for profit*

---

1. Straddles come in all shapes, sizes, and—well—species: there are forward straddles and backward straddles, bull straddles and bear straddles, butterfly straddles and condor straddles. Each presents its own financial risks and rewards. See the Tax Court's decision, *Leslie v. Commissioner*, 71 T.C.M. (CCH) 2233 (1996).

2. In addition to the substantive claims discussed *infra*, the Leslies argued that the Tax Court erred in admitting the report and testimony of the Commissioner's expert witness, Dr. Richard Teweles. In view of our treatment of the Leslies' tax-law-based contentions, we need not address the evidentiary issue.

though not connected with a trade or business." DEFRA § 108(a), Pub.L. No. 98–369, 98 Stat. 494, as amended retroactively by § 1808(d) of the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2817 (emphasis added).[3] The Leslies have not alleged that Robert incurred his losses in the course of a trade or business. Consequently, we must focus our attention on the question whether Robert's motives for entering into the tax straddle transactions sponsored by Hunter were aimed at generating profit (which would render the losses deductible), or instead were aimed at saving taxes (which would render them nondeductible). The Commissioner's initial determination that Robert's primary motivation was to secure tax savings is presumptively correct, see Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933), and the burden of proving profit-motive is on the taxpayer, see Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir.1993). The Tax Court agreed with the Commissioner and concluded that Robert's "motives in entering into these transactions, despite [the Leslies'] arguments to the contrary, were primarily to obtain substantial tax benefits." Leslie v. Commissioner, 71 T.C.M. (CCH) 2233, 2242 (1996).

■ The Tax Court's determination that Leslie entered into the tax straddle at issue for tax savings rather than for profit is a finding of fact, and is therefore reviewable only for clear error. See Independent Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 727 (9th Cir.1986). Consequently, we must uphold the Tax Court's conclusion unless we are "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). In other words, if the Tax Court's account of the evidence is "plausible in light of the record viewed in its entirety, [we] may not reverse it even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently." Wolf, 4 F.3d at 712–13 (quoting Service Employees Int'l Union v. Fair Political

Practices Comm'n, 955 F.2d 1312, 1317 n. 7 (9th Cir.1992) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985))).

In Ewing v. Commissioner, 91 T.C. 396, 1988 WL 89128 (1988), aff'd without opinion, 940 F.2d 1534 (9th Cir.1991), the Tax Court considered precisely the same Hunter straddle scheme at issue in this case, and concluded that the investors involved there were motivated by tax savings and not by profit. See id. at 420. We, of course, recognize that the Ewing decision is not conclusive of the Leslies' appeal; the motivation inquiry is an individualized one, dependent upon the particular taxpayer's state of mind. It cannot be doubted, however, that Ewing—called "the test case for the F.G. Hunter transactions," Nolte v. Commissioner, 69 T.C.M. (CCH) 1828, 1829 (1995), aff'd without opinion, 99 F.3d 1146 (9th Cir.1996)—is highly relevant to the Leslies' case, and weighs in favor of affirming the Tax Court's decision.

■ Even aside from Ewing, uncontroverted objective evidence amply supports the Tax Court's conclusion that Robert's primary motive in participating in the Hunter straddle was to realize tax benefits. As the Tax Court pointed out, what sets the Hunter program apart from other straddle investment opportunities is its use of the alternative liquidation techniques of "cancellation" and "assignment" in place of the more traditional "offset" procedure. The unique close-out methods were designed to provide maximum tax savings in closing straddle contracts:

> Specifically, the "cancellation" technique was devised so that its proponents could claim ordinary loss treatment rather than capital loss treatment. The "assignment" procedure was contrived so that Hunter investors could characterize straddle gains as long-term capital gains instead of short-term capital gains.

Id. at 2242. The promotional material distributed to prospective clients—which Robert

---

3. Congress enacted § 108 in 1984 "to clarify the law governing [pre–1982] straddles." Because § 108 was solely retroactive, dealing only with transactions consummated before 1982, it was

never codified in the Internal Revenue Code. Horn v. Commissioner, 968 F.2d 1229, 1233 n. 5 (D.C.Cir.1992). Rather, § 108 appears only in the notes following 26 U.S.C. § 1092.

stipulated he read—emphasized the tax advantages of the Hunter program, focusing specifically on the alternative liquidation procedures. For instance, one portion of the "Questions and Answers" section of the promotional materials provided:

3. Can I lose my investment?

Yes. As with any investment, the risk of loss is commensurate with the opportunities for profit. However, the opportunity for profit can be considerably enhanced, and the risk of loss substantially reduced by the proper choice of alternative methods of liquidating your contracts.

\* \* \* \* \* \*

8. How can the probability of gain be increased by choice of liquidation methods?

Income tax treatment of your gains or losses on each contract will be different depending upon the way your contract is closed out. There are ways to close out a contract in which you have a gain so that it will be taxed as a long term capital gain. For the contract in which you have a loss, you may liquidate so as to have ordinary loss. Depending upon your tax bracket, your risk of after tax loss on both these contracts will be very substantially reduced and will quite possibly be converted into an after tax gain. Any net pre-tax profit will be significantly increased.

The promotional literature read by Leslie also included a series of graphs demonstrating pre- and post-tax profit potential for Hunter straddle investments and provided a worksheet designed for calculating "Tax Savings" achieved through the Hunter program. In addition, prior to investing, Leslie received and reviewed a 24–page opinion letter "concerning the federal income tax consequences" of the straddle contracts and a document entitled "Summary of Federal Income Tax Consequences." Both the letter and the summary detailed the various close-out options provided by the Hunter straddle program and the income tax consequences of each of the options.

Robert didn't just read about the alternative liquidation options, however. He apparently put them to work. As pointed out by the Commissioner in his brief, Robert "fol-

lowed to a tee the instructions he had read in the promotional materials for obtaining tax benefits through cancellation of loss contracts and assignment of gain contracts." Indeed, Robert admitted in his reply brief to using the cancellation and assignment procedures, and argued there only that the techniques are "lawful." Whether or not they are legal, however, is not the pertinent issue; rather, the issue is whether Robert's investment decisions were profit-driven or tax-driven. And on that score, Robert seemed candidly to concede that his use of the close-out procedures was motivated by his desire to minimize his tax liability:

It is axiomatic that a taxpayer has the right to arrange his affairs in such a manner as to minimize his tax liability to the fullest extent possible.... Leslie (as a taxpayer) has every right under law to make economically *bona fide* arrangements to reduce the amount of tax he owes. In the instant case, Leslie lawfully and appropriately reduced his taxes by engaging in legitimate economic transactions (i.e. cancellation and assignment of gold futures contracts) during the close out phase of his Hunter contracts.

Appellants' Reply Brief at 5.

In determining whether Robert's utilization of the cancellation and assignment close-out procedures indicates a tax-savings motivation, we think it significant, as did the Tax Court, that he "paid more in commissions and fees than he would have incurred had he liquidated his futures contracts in the usual way." *Leslie,* 71 T.C.M. (CCH) at 2242. For instance, the Tax Court noted, Robert was charged $15,520.14 for cancelling 175 gold futures contracts in December 1980, whereas his bill for offsetting those same contracts would have come to only $1750.00. *See id.; see also Ewing,* 91 T.C. at 408 (noting Hunter's fees for different close-out techniques). In fact, the Leslies' own expert admitted at trial that Hunter's commissions for the alternative liquidation techniques were "double" those charged for a traditional closeout. The increased commissions, however, bore their own rewards. In return for these increased fees, the Tax Court found, the Leslies would obtain ordinary loss deduc-

tions in the amount of $1.5 million for 1980. *See Leslie,* 71 T.C.M. (CCH) at 2242. We doubt that Robert's willingness to pay a premium for Hunter's special close-out procedures—procedures that led to substantial tax savings—was coincidental; rather, like the Tax Court, we are persuaded that it is potent evidence that Robert's motivation in entering the transactions was something other than turning a profit.

The Leslies maintained that the Tax Court "ignore[d]" evidence tending to show that Robert's motive in entering into the Hunter straddle investments was profit. They pointed first to Robert's own trial testimony, in which he suggested that he "had no clue what the difference was between ordinary and capital losses, long and short term capital gain or even how the Close Out Procedures actually worked." They also pointed to Robert's claim at trial that although he read the promotional material before "ultimately" investing, he had essentially already made up his mind prior to reading the literature. Finally, they pointed to Robert's investment history, which, they contended, demonstrates his "historic quest for substantial profits." As the *Fox* and *Ewing* cases teach, and as the Tax Court specifically observed, however, "greater weight is to be given objective facts than to self-serving statements characterizing intent." *Id.* at 2241 (quoting *Ewing,* 91 T.C. at 418).

We do not pretend that the evidence suggesting the primacy of a motivation other than profit is airtight. It is conceivable, we suppose, that Robert's tax-savings motive, although significant, was no more significant than his profit motive. However, as an appellate court, we do not sit in de novo review of the Tax Court's decision regarding motivation. And it is certainly not *inconceivable* that Robert's concern for tax savings did predominate, as the Tax Court found. Indeed, we conclude that, on balance, the evidence supports the Tax Court's determination. At any rate, its decision assuredly was not clearly erroneous, and we therefore decline to disturb it.

### III

■ The Leslies also claimed that, even assuming that Robert's motivation was not profit-oriented, they are entitled to a "net loss" deduction on their 1982 return insofar as Robert's losses sustained in 1980 from straddle transactions exceeded his straddle gains earned in 1981 and 1982. Section 108(c) of DEFRA provides that, even if a loss from a straddle transaction is not allowed as a deduction under § 108(a) because the underlying transaction is deemed to have been entered into for tax savings and not for profit, "such loss shall be allowed in determining the gain or loss from dispositions of other positions in the straddle to the extent required to accurately reflect the taxpayer's net gain or loss from all positions in such straddle." DEFRA § 108(c). Emphasizing the language "net gain or loss," the Leslies argued that it is "quite clear" from the face of the statute that the net loss from a straddle transaction is properly deductible. Invoking the applicable Treasury Regulation, 26 C.F.R. § 1.165–13T, and *Nolte v. Commissioner,* 69 T.C.M. (CCH) 1828 (1995), *aff'd without opinion,* 99 F.3d 1146 (9th Cir.1996), however, the Tax Court rejected the Leslies' interpretation, and held that they may use the losses only to offset straddle gains and may not deduct a "net loss" from other income. The Tax Court's interpretation of § 108(c), like the interpretation of any statute, is reviewable de novo. *See Parravano v. Babbitt,* 70 F.3d 539, 543 (9th Cir.1995).

■ Although § 108(c) does mention the phrase "net loss," it nowhere explicitly states that such net loss shall be deductible; indeed, it never prescribes *what* should be done in the event a net loss is sustained. However, the applicable Treasury Regulation, relevant cases, and canons of statutory interpretation all counsel against the construction of § 108(c) the Leslies proffer, and in favor of the Commissioner's reading: Tax-motivated straddle losses may offset straddle gains, thus reducing an investor's tax liability, but a net loss resulting from straddle transactions may not be deducted against other income. The relevant Treasury Regulation, which "concern[s] the treatment of losses on certain straddle transactions," provides:

Q–3. If a loss is disallowed in a taxable year (year 1) because the transaction was not entered into for profit, is the entire gain from the straddle occurring in a later taxable year taxed?

A–3. No. Under section 108(c) of the Act the taxpayer is allowed to *offset the gain* in the subsequent taxable year by the amount of loss (including expenses) disallowed in year 1.

26 C.F.R. § 1.165–13T (emphasis added). The *regulation's* explicit and exclusive reference to "offset[ting] the gain" certainly suggests that the losses may be used by the taxpayer to reduce his taxable gain, but may not be used to create a net loss (*i.e.*, over and above straddle gain) that is deductible against his gross income. In other words, up to and including the break-even point, tax-motivated straddle losses are subtracted from straddle gains and the difference is taxed. However, past the break-even point—where the taxpayer is sustaining a net loss—nothing happens; obviously, there is no taxable gain, but neither is there any positive loss to be deducted against other income. The Leslies cite *The Ann Jackson Family Foundation v. Commissioner*, 15 F.3d 917 (9th Cir.1994), for the proposition that interpretive regulations should not be followed if they "fail to implement the Congressional mandate in a reasonable manner." It is far from obvious, however, that the "Congressional mandate" of § 108(c) is what the Leslies claim it is. The language of the statute is not altogether clear regarding the tax consequences of a straddle transaction net loss; consequently, it was not inappropriate for the Tax Court to look to the Treasury Regulation for interpretive guidance.

The correctness of the Tax Court's interpretation is further confirmed by two recent cases, both of which involve the very Hunter straddle scheme at issue in this case. In *Nolte*, the court held that it was "clear that petitioners are only entitled to offset their gains by the amount of the losses," and "are not entitled to an additional deduction for their 'net' losses in excess of their straddle gains." *Nolte*, 69 T.C.M. (CCH) at 1834. Likewise, in *Ewing*, the Tax Court cited the above-referenced Treasury Regulation and held that under § 108(c), the petitioners were "entitled to *offset their gains* ... by any losses that are not allowable ... under section 108(a)." *Ewing*, 91 T.C. at 421 (emphasis added).

The Tax Court's construction of § 108(c) finds additional support in comparable provisions of the Internal Revenue Code that losses resulting from transactions not entered into for profit are not deductible, *see* 26 U.S.C. § 165(a)-(c) ("There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.... Th[at] deduction ... shall be limited to ... losses incurred in any transaction entered into for profit."); DEFRA § 108(a) (generally limiting deductions to those losses, if not incurred in a trade or business, "incurred in a transaction entered into for profit").

Finally, respect for statutory structure dictates that the Commissioner's interpretation of § 108(c) must be the correct one. Under the Leslies' construction, so long as an investor could muster a single dollar—or even a single penny—in tax-motivated straddle gains in a given year, he could deduct from his gross income in that year the "net loss" on his straddle transactions considered as a unit, no matter how large the loss. In other words, a substantial loss deemed nondeductible could—by virtue of a minimal gain—become deductible. Obviously, such an interpretation flies in the face of § 108(a)'s categorical prohibition on deductions of losses for tax-motivated straddle transactions; § 108(c)'s exception would swallow § 108(a)'s rule (at least all but a penny's worth of it), rendering § 108(a) a virtual nullity. We decline to adopt such an awkward and a contextual reading of § 108(c). *See United Savings Ass'n v. Timbers of Inwood Forest*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) ("Statutory construction ... is a holistic endeavor.").

In light of the foregoing, we conclude, as did the Tax Court, that the Leslies are not entitled under § 108(c) to deduct net losses sustained after closing both legs of their tax straddles in 1982.

## IV

The Leslies argued to the Tax Court that they should be able to deduct the commissions paid to Hunter because the fees were "incurred in connection with the purchase and sale of capital assets." In support of their position, the Leslies cited 26 C.F.R. § 1.263(a)–2(e) (which lists "commissions paid in purchasing securities" among "capital expenditures"), *Spreckels v. Helvering*, 315 U.S. 626, 62 S.Ct. 777, 86 L.Ed. 1073 (1942), and *Soeder v. Commissioner*, 13 T.C.M. (CCH) 200 (1954). The Tax Court concluded, however, that the Leslies' reliance on all three sources was "unfounded since both the regulation[ ] and the cases cited deal with taxpayers who were involved in securities or commodities transactions entered into *primarily for profit*." *Leslie*, 71 T.C.M. (CCH) at 2242.

On appeal, the Leslies raised the very same argument (citing the very same authorities) that they had raised before the Tax Court, and made no attempt whatsoever to counter the Tax Court's rejection of that argument. The Tax Court followed clearly established precedent in disallowing the deduction of fees arising out of tax-motivated (as opposed to profit-motivated) investments. The court in *Ewing* unmistakably held that where taxpayers "entered into their straddle transactions primarily to obtain tax deductions, the fees paid by petitioners constituted payments to purchase such deductions and are nondeductible personal expenditures." *Ewing*, 91 T.C. at 421; *see also Brown v. Commissioner*, 85 T.C. 968, 1000, 1985 WL 15423 (1985) ("Inasmuch as we have found that the program was operated solely to provide tax deductions for its participants, the fees constituted payments to purchase such deductions and as such are, at best, personal expenditures which are not deductible."), *aff'd sub nom., Sochin v. Commissioner*, 843 F.2d 351 (9th Cir.1988). The Tax Court's resolution of the fees issue comports with common sense. In view of the tax code's proscription against deducting losses incurred on tax-motivated transactions, it would be anomalous indeed if the commissions paid to procure those losses were themselves deductible. In light of the clear, and eminently sensible, distinction drawn in Tax Court precedent between fees paid in profit-motivated transactions and fees paid in tax-motivated transactions, we affirm the Tax Court's decision that the Leslies are not entitled to deduct the fees and commissions paid to Hunter.

## V

Finally, the Tax Court held that the Leslies were liable for increased interest on their underpayment pursuant to 26 U.S.C. § 6621(c).[4] Its decision in that respect is an issue of statutory construction, subject to de novo review. *See Parravano*, 70 F.3d at 543.

The Commissioner seeks enhanced interest pursuant to 26 U.S.C. § 6621(c) on tax liabilities that remained outstanding after December 1, 1984, the statute's effective date.[5] Section 6621(c)(3)(1) provides for enhanced interest rate of 120% of the underpayment rate on any "substantial underpayment attributable to tax motivated transactions." Within the meaning of the statute, "substantial underpayment" refers to any liability exceeding $1000 in a given taxable year. *See* 26 U.S.C. § 6621(c)(2). More importantly, for purposes relevant to this appeal, § 6621(c)(3)(A)(iii) provides that " 'tax motivated transaction' means . . . any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092)."

Section 1092(c)(1) defines the word "straddle" in the following terms: "The term 'straddle' means offsetting positions with respect to personal property." An "offsetting

---

4. Section 6621(c) was repealed in 1989; however, the repeal is effective only for returns due after December 31, 1989, and is therefore inapplicable to the Leslies' appeal. *See Feldman v. Commissioner,* 20 F.3d 1128, 1136 (11th Cir. 1994).

5. It is well settled that § 6621 applies to interest accruing after December 31, 1984, even though the transaction at issue was entered into prior to that date. *See, e.g., Carberry v. Commissioner of Internal Revenue,* 933 F.2d 1124, 1129 (2d Cir. 1991); *Kennedy v. Commissioner,* 876 F.2d 1251, 1256 (6th Cir.1989); *Solowiejczyk v. Commissioner,* 85 T.C. 552, 555–57, 1985 WL 15399 (1985), *aff'd,* 795 F.2d 1005 (2d Cir.1986).

position with respect to personal property" occurs "if there is a substantial diminution of the taxpayer's risk of loss from holding any position with respect to personal property by reason of his holding 1 or more other positions with respect to personal property (whether or not of the same kind)." 26 U.S.C. § 1092(c)(2)(A).

The Leslies correctly note that § 1092 itself "appl[ies] to property acquired and positions established by the taxpayer after June 23, 1981, in taxable years ending after such date." Pub.L. No. 97–34, § 508(a) (printed in notes following 26 U.S.C. § 1092). They contend that because their "positions" were "established" prior to June 23, 1981, § 1092 does not "apply" to their transactions, and, therefore, that § 6621(c)(3)(A)(iii)—which incorporates § 1092's definition of straddle— does not apply to their transactions either. The Leslies' argument is interesting but ultimately unavailing.

The Leslies are undoubtedly correct that the substantive provisions of § 1092 itself, and the tax consequences that follow therefrom, do *not* apply to their transactions. Subsection 1092(a)(1)(A), for instance, provides that

> [a]ny loss with respect to 1 or more positions shall be taken into account for any taxable year only to the extent that the amount of such loss exceeds the unrecognized gain (if any) with respect to 1 or more positions which were offsetting positions with respect to 1 or more positions from which the loss arose.

Clearly, neither that provision nor any tax liability that it might trigger apply to the Leslies' straddle transactions. In this case, however, the Tax Court did not "apply" § 1092 as such. The only Internal Revenue Code provision being "applied" to the Leslies' transactions was § 6621. Section 6621—not § 1092—is the only provision relevant to the interest enhancement issue under which any tax consequences were alleged.

Section 6621(c)(3)(A)(iii) references § 1092 for one simple reason: § 1092 contains what the drafters of § 6621 deemed to be a useful definition of "straddle." In the interest of expediency, rather than trotting out the same exact definition again, they simply cross referenced § 1092, which a prior Congress had already adopted. The effect, however, is the same. To repeat, § 6621(c)(3)(A)(iii) provides that " 'tax motivated transaction' means ... any straddle (as defined in section 1092(c))." Section 1092, in turn, defines "straddle" as an "offsetting position[ ] with respect to personal property." Consequently, § 6621(c)(3)(A)(iii)—the section under which the Commissioner is seeking the enhancement—*might as well say* that " 'tax motivated transaction' means ... any ... offsetting position[ ] with respect to personal property." When the substitution is explicitly made, it becomes clear that the Leslies' challenge to the Tax Court's imposition of enhanced interest must fail. No one disputes that the straddles that the Leslies entered into were "offsetting positions with respect to personal property"; hence, they were within the substantive definition of "straddle" incorporated by reference into § 6621(c)(3)(A)(iii). We therefore hold that notwithstanding the fact that the Leslies established their straddle positions after the June 23, 1981 effective date of § 1092, their straddles are nonetheless "straddles" within the meaning of § 6621(c)(3)(A)(iii).

The case law provides strong support for our interpretation. Indeed, *Solowiejczyk v. Commissioner*, 85 T.C. 552, 1985 WL 15399 (1985), *aff'd without opinion*, 795 F.2d 1005 (2d Cir.1986), is almost directly on point. In that case, the Commissioner sought increased interest pursuant to § 6621(c)(3)(A)(i), which defines "tax motivated transaction" as "any valuation overstatement (within the meaning of section 6659(c))." The taxpayer there argued that § 6621(c)(3)(A)(i) did not apply to him, because the provision that included the referenced definition of "valuation overstatement"— § 6659—was effective only for tax returns filed after December 31, 1981, which his was not. The argument, which runs directly parallel to the argument advanced by the Leslies, was squarely rejected by the *Solowiejczyk* court:

> The issue for decision herein centers upon the imposition of an increased rate of interest pursuant to 6621(c). Section 6659(c) comes under consideration only with respect to the definition of valuation overstatement contained therein, which is in-

corporated by reference into section 6621(c)(3)(A)(i). Although section 6659(c) is effective only for tax returns filed after December 31, 1981, no addition to tax pursuant to section 6659 is sought herein and, therefore, the [date] limitation with respect to that statute is irrelevant. Section 6621(c) was enacted on July 18, 1984, and is effective as to interest accruing after December 31, 1984. Respondent here seeks to apply that section to interest which accrued after December 31, 1984, on petitioner's underpayment of their 1978 tax liability.

*Id.* at 555.[6]

 In addition to *Solowiejczyk*, there is further circumstantial evidence from the annals of Tax Court precedent suggesting that the government's construction of § 6621(c)(3)(A)(iii)—as merely referencing § 1092 for the definition of straddle—is the proper one. First and foremost, there is very specific Tax Court precedent for applying § 6621(c)(3)(A)(iii) to straddles—like the Leslies'—entered into *prior* to the June 23, 1981 effective date of § 1092. For instance, in *Walker v. Commissioner*, 60 T.C.M. (CCH) 1340 (1990), the court specifically noted that § 6621(c)(3)(A)(iii) defined "tax motivated transaction" to include "any straddle (as defined in section 1092(c) ... )." The court nonetheless concluded that straddles entered into in 1979—well before the June 23, 1981 cutoff date—were subject to the

enhanced interest provisions of § 6621. Moreover, in a number of decisions, the Tax Court has, when quoting § 6621(c)(3)(A), *affirmatively omitted* reference to § 1092. Instead, the cases provide that the term "tax motivated transaction" means "(iii) any straddle * * *." *E.g. Segal v. Commissioner*, 64 T.C.M. (CCH) 99, 116 (1992), *aff'd without opinion*, 41 F.3d 1144 (7th Cir.1994); *Taft v. Commissioner*, 54 T.C.M. (CCH) 962, 968 (1987). In still other Tax Court decisions, the court has paraphrased § 6621(c)(3)(A) as including "any straddle," without any ellipsis *or* specific reference to § 1092. *E.g., Ewing*, 91 T.C. at 422; *Starr v. Commissioner*, 62 T.C.M. (CCH) 1417, 1422 (1991). Both groups of cases—those that substitute "* * *" for § 1092 and those that make generic reference to "straddles" without any mention of § 1092 whatsoever—confirm that the Tax Court views § 1092 as relevant to the § 6621 analysis solely for the purposes of definition. We approve the Tax Court's interpretation.[7]

## VI

The Tax Court was correct to deny the Leslies the relief they requested. Its decision is affirmed in all respects.

**AFFIRMED.**

---

6. At the time *Solowiejczyk* was decided the section number was 6621(d), not 6621(c). For convenience, however, we refer to the provision as § 6621(c).

7. In the end, even apart from § 6621(c)(3)(A) and the potential interpretive difficulties that it engenders, *see* Robert B. Martin, Jr., *Coping with the Tax Shelter Registration and Compliance Requirements*, 62 J. Tax'n 2, 6 (1985), the Commissioner possesses the authority to impose the enhanced interest penalty pursuant to § 6621(c)(3)(B). Pursuant to § 6621(c)(3)(B), "[t]he Secretary [of the Treasury] may by regulations specify other types of transactions which will be treated as tax motivated." Under that grant of authority, the Secretary promulgated § 301.6621–2T, which adds to § 6621's list of five specific tax motivated transactions "[a]ny deduction disallowed for any period under section 165(c)(2), relating to any transaction not entered into for profit." 26 C.F.R. § 301.6621–2T, Q & A–4. We have already expressed our view that the Leslies' straddle transactions were

not "entered into for profit" within the meaning of DEFRA § 108(a). *See supra* Part II. DEFRA § 108(a) merely "restates [the] existing law" under 26 U.S.C. § 165(c)(2). *See* 26 C.F.R. § 1.165–13T, Q & A–2; *see also Dewees v. Commissioner*, 870 F.2d 21, 29 (1st Cir.1989) ("Congress enacted § 108 to clarify the application of the general loss deduction rule of § 165 to straddle transactions."). The determination whether or not certain transactions were "entered into for profit" is measured by the same standard in both sections. *See, e.g., Ewing*, 91 T.C. at 417. Indeed, the Leslies candidly conceded as much in their briefs to this court. Consequently, because the Leslies' claimed deductions were "deduction[s] disallowed ..., relating to any transaction not entered into for profit," they fit within the enhanced interest Treasury Regulation adopted pursuant to § 6621(c)(3)(B). *See, e.g., id.* at 422; *Thurner v. Commissioner*, 60 T.C.M. (CCH) 961, 976–77 (1990).