**Michael SKLAR; Marla Sklar, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent– Appellee.**

**No. 00–70753.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 7, 2001.

Filed Jan. 29, 2002.

Amended Feb. 27, 2002.

---

1. The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

Jeffrey I. Zuckerman, Curtis, Mallet-Prevost, Colt & Mosle, Washington, DC, for the appellants.

Thomas J. Sawyer, Attorney, Tax Division, Department of Justice, Washington, DC, for the appellee.

David Zwiebel, New York, NY, for amicus curiae Agudath Israel of America, in support of the appellants.

Before PREGERSON, REINHARDT and SILVERMAN, Circuit Judges.

Opinion by Judge REINHARDT; Concurrence by Judge SILVERMAN

## AMENDED OPINION

REINHARDT, Circuit Judge.

The taxpayer-petitioners in this action, Michael and Marla Sklar, challenge the Internal Revenue Service's ("IRS") disallowance of their deductions, as charitable contributions, of part of the tuition payments made to their children's religious schools. In the notice of deficiency sent to the Sklars, the IRS explained that "[s]ince these costs are personal tuition expenses, they are not deductible." Specifically, the Sklars sought to deduct 55% of the tuition, on the basis that this represented the proportion of the school day allocated to religious education. The Sklars contend that these costs are deductible under section 170 of the Internal Revenue Code, as payments for which they have received "solely intangible religious benefits." They also argue that they should receive this deduction because the IRS permits similar deductions to the Church of Scientology, and it is a violation of administrative consistency and of the Establishment Clause to deny them, as Orthodox Jews, the same deduction. The Tax Court found that under *De Jong v. Commissioner*, 309 F.2d 373, 376(9th Cir.1962), tuition paid for the education of a taxpayer's children is a personal expense which is non-deductible under § 170. The Tax Court also rejected the administrative inconsistency argument and the Establishment Clause claim, and ruled inadmissible several documents supporting the Sklars' contentions with respect to the Church of Scientology on the ground that the Sklars are not similarly situated to the members of the Church of Scientology. The Sklars filed this timely appeal.

We review the Tax Court's conclusions of law and its construction of the tax code de novo, and no deference is owed that court on its application of the law. *Schachter v. Commissioner*, 255 F.3d 1031, 1033 (9th Cir.2001); *Custom Chrome, Inc. v. Commissioner*, 217 F.3d 1117, 1121 (9th Cir.2000); *Leslie v. Commissioner*, 146 F.3d 643, 650 (9th Cir.1998).

### I. The Provisions of the Tax Code Governing Charitable Contribution Deductions Do Not Appear to Permit the Deduction Claimed by the Sklars

The Sklars assert that the deduction they claimed is allowable under section 170 of the Internal Revenue Code which permits taxpayers to deduct, as a charitable contribution, a "contribution or gift" to certain tax-exempt organizations. Not only has the Supreme Court held that, generally, a payment for which one receives consideration does not constitute a "contribution or gift" for purposes of § 170, *see United States v. American Bar Endowment*, 477 U.S. 105, 118, 106 S.Ct. 2426, 91 L.Ed.2d 89 (1986) (stressing that "[t]he *sine qua non* of a charitable contribution is a transfer of money or property without adequate consideration"), but it has explicitly rejected the contention made here by the Sklars: that there is an exception in the Code for payments for which one receives only religious benefits in return. *Hernandez v. Commissioner*, 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). The taxpayers in *Hernandez*, members of the Church of Scientology, sought to deduct, as charitable contributions under § 170(c), payments made by them to the Church of Scientology in exchange for the religious exercises of "auditing" and "training."[1] The Court af-

---

1. The Supreme Court, in *Hernandez*, described "auditing" as the process by which, through a one-to-one encounter with a Church of Scientology official, one becomes aware of his spiritual dimension. 490 U.S. at 684–85, 109 S.Ct. 2136. The Court describes "training" as one of several "doctrinal courses" in which members study the tenets

firmed the Tax Court's reading of the statute disallowing the deductions on the following three grounds: (1) Congress had shown no preference in the Internal Revenue Code for payments made in exchange for religious benefits as opposed to other benefits, 490 U.S. at 692–93, 109 S.Ct. 2136; (2) to permit the deductions the taxpayers demanded would begin a slippery slope of expansion of the charitable contribution deduction beyond what Congress intended, 490 U.S. at 693, 109 S.Ct. 2136; and (3) to permit these deductions could entangle the IRS and the government in the affairs and beliefs of various religious faiths and organizations in violation of the constitutional principle of the separation of church and state, 490 U.S. at 694, 109 S.Ct. 2136. Specifically, the Supreme Court stated that to permit these deductions might force the IRS to engage in a searching inquiry of whether a particular benefit received was "religious" or "secular" in order to determine its deductibility, a process which, the Court said, might violate the Establishment Clause. *Hernandez*, 490 U.S. at 694, 109 S.Ct. 2136.

Despite the clear statutory holding of *Hernandez*, the Sklars contend that recent changes to the Internal Revenue Code have clarified Congressional intent with respect to the deductibility of these payments. We seriously doubt the validity of this argument. The amendments to the Code appear not to have changed the substantive definition of a deductible charitable contribution, but only to have enacted additional documentation requirements for claimed deductions. Omnibus Budget Reconciliation Act of 1993 ("OBRA'93"),

P.L. No. 103–66, 107 Stat. 312 (codified as amended in scattered sections of 26 U.S.C.). Section 170(f) of the Code adds a new requirement that taxpayers claiming a charitable contribution deduction obtain from the donee an estimate of the value of any goods and services received in return for the donation, and exempts *from that new estimate requirement* contributions for which solely intangible religious benefits are received.[2] I.R.C. § 170(f)(8)(A) & (B)(ii). Similarly, § 6115 requires that tax-exempt organizations inform taxpayer-donors that they will receive a tax deduction only for the amount of their donation above the value of any goods or services received in return for the donation and requires donee organizations to give donors an estimate of this value, exempting *from this estimate requirement* contributions for which solely intangible religious benefits are received.

Given the clear holding of *Hernandez* and the absence of any direct evidence of Congressional intent to overrule the Supreme Court on this issue, we would be extremely reluctant to read an additional and significant substantive deduction into the statute based on what are clearly procedural provisions regarding the documentation of tax return information, particularly where the deduction would be of doubtful constitutional validity. *Hernandez*, 490 U.S. at 694, 109 S.Ct. 2136; *see Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (holding that a statute is unconstitutional under the Establishment Clause if it fosters "an excessive government entanglement with religion"). We need not, however, decide

---

of the faith and train to become the leaders of auditing sessions. 490 U.S. at 685, 109 S.Ct. 2136.

2. Section 170(f)(8)(C) permits the donee organization to provide this acknowledgment information to the IRS directly on its own tax return instead, thereby relieving the donor of this obligation.

this issue definitively in this case.[3]

## II. The IRS Policy Regarding the Church of Scientology May Not Be Withheld from Public Scrutiny and Appears to Violate the Establishment Clause; Further, It Appears That the Sklars Have Not Made Out a Claim of Administrative Inconsistency

Additionally, the Sklars claim that the IRS engages in a "policy" of permitting members of the Church of Scientology to deduct as charitable contributions, payments made for "auditing," "training," and other qualified religious services, and that the agency's refusal to grant similar religious deductions to members of other faiths violates the Establishment Clause and is administratively inconsistent. They assert that the "policy" is contained in a "closing agreement"[4] that the IRS signed with the Church of Scientology in 1993, shortly after the *Hernandez* decision and the 1993 changes to § 170 of the Internal Revenue Code.[5] Because the IRS errone-

ously asserted that it is prohibited from disclosing all or any part of the closing agreement, we assume, for purposes of resolving this case, the truthfulness of the Sklars' allegations regarding the terms of that agreement. However, rather than concluding that the IRS's pro-Scientology policy would require it to adopt similar provisions for all other religions, we would likely conclude, were we to reach the issue, that the policy must be invalidated on the ground that it violates either the Internal Revenue Code or the Establishment Clause. *See Hernandez*, 490 U.S. at 694, 109 S.Ct. 2136; *Lemon v. Kurtzman*, 403 U.S. at 612–13, 91 S.Ct. 2105.

## A. The IRS's Refusal to Disclose the Terms of Its Closing Agreement with the Church of Scientology

We are required, for purposes of our analysis, to assume the contents of the IRS's policy towards the Church of Scientology, because of the IRS's refusal to reveal to the Sklars, to this court, or even to the Department of Justice,[6] the contents

---

3. Our concurring colleague may well be correct that *Hernandez* is still controlling of this case and that § 170 has not been amended to permit deductions of contributions for which the consideration consists of "intangible religious benefits." As we have stated in the text, we are strongly inclined to that view ourselves. However, we need not issue a definitive holding on the effect of the statutory amendments here, because we can reject the Sklars' claim on the ground that they have failed to satisfy the requirements for the partial deductibility of dual payments set out in *United States v. American Bar Endowment*, 477 U.S. 105, 106 S.Ct. 2426, 91 L.Ed.2d 89 (1986). *Anderson v. United States*, 417 U.S. 211, 218, 94 S.Ct. 2253, 41 L.Ed.2d 20 (finding it "inadvisable ... reach out ... to pass on important questions of statutory construction when simpler, and more settled, grounds are available for deciding the case at hand"). *See* Section IV, *infra* (rejecting the Sklars' claim on the "dual payment" ground).

4. Closing agreements are governed by I.R.C. § 7121, which permits the IRS to enter into "an agreement in writing with any person relating to the liability of such person (or of the person or estate for whom he acts) in respect of any internal revenue tax for any taxable period." I.R.C. § 7121(a); 26 C.F.R. § 301–7121–1.

5. The year 1993 also saw the issuance by the IRS of *Church of Scientology*, Revenue Ruling 93–73, 1993 WL 436350 (RRU Nov. 1, 1993), which declared "obsolete" *Church of Scientology*, Revenue Ruling 78–189, 1978 WL 42290 (RRU 1978), which had explicitly prohibited the deduction of the costs of auditing, training and other courses in the Church of Scientology as charitable contribution deductions under § 170.

6. At oral argument the Justice Department lawyer specifically represented to the court that the Department of Justice has not been informed of the contents of the agreement,

of its closing agreement, although that agreement has apparently been reprinted in the Wall Street Journal. *See Scientologists and IRS Settle for $12.5 Million,* Wall St. J., Dec. 30, 1997, at A12; agreement reprinted in Wall St. J. Interactive Edition (www.wsj.com). The IRS insists that the closing agreement in this case cannot be disclosed as it contains return information which the IRS is required to keep confidential under I.R.C. § 6103. Under § 6103, the IRS is prohibited from disclosing "return information," which is defined to include closing agreements. I.R.C. § 6103(2).[7] The prohibitions of § 6103 are subject to § 6104, where that provision applies, and § 6104 mandates public disclosure by each tax-exempt entity of its application for tax exemption (which itself contains detailed financial information about the entity, including revenues and expenses) as well as all documentation in support of that application. § 6104(a)(1)(A). The legislative history of the amendment to § 6103 which added closing agreements to the definition of "return information," makes it clear that

> [t]he [new] provision [§ 6103(b)(2)(D)] is not intended to foreclose the disclosure of tax-exempt organization closing agreements to the extent that such dis-

closure is authorized under section 6104. Since section 6103 permits the disclosure of return information as authorized by Title 26, a disclosure authorized by section 6104 is permissible, notwithstanding the fact that a closing agreement is return information.

H.R. Conf. Rep. No. 106–1033, 2000 WL 1868642 at *1010 (footnote omitted).

In *Tax Analysts v. IRS,* 214 F.3d 179 (D.C.Cir.2000), the only circuit court case on this issue, the D.C. Circuit rejected the IRS's argument, and held that disclosure of closing agreements is not categorically prohibited by § 6103, but may be required under § 6104. The legislative history of the § 6103 amendment, in addition to stating that § 6104 may still require disclosure of tax-exempt organization closing agreements, also specifically cites to *Tax Analysts,* stating that the new provision does not overrule its reasoning or its result. The *Tax Analysts* court concluded that the IRS's reading of § 6103 was directly at odds with the broad language of § 6104, the statutory provision requiring public disclosure by each tax-exempt entity of its application for tax exemption as well as all documentation in support of that application. § 6104(a)(1)(A).[8] In that

---

even for purposes of this appeal, because the IRS deems it to be confidential.

7. In our original opinion we stated that " § 6103 does not discuss closing agreements, nor does it explicitly prohibit their disclosure." Slip Op. at 1379–1380. Shortly after the issuance of the opinion, however, the IRS brought to the court's attention that subsequent to briefing in this case, Congress had amended § 6103 to prohibit the disclosure of closing agreements. I.R.C. § 6103(b)(2)(D). Despite this statutory change, our conclusion that § 6103 does not *categorically* prohibit the disclosure of closing agreements remains the same. As the IRS concedes, some "return information" prohibited from disclosure under § 6103 may nevertheless be required to be disclosed by tax-exempt entities under

§ 6104, because the disclosure prohibitions of § 6103 are subject to the mandatory disclosure requirements of § 6104. Therefore the critical question is not whether closing agreements constitute "return information" under § 6103, but whether they constitute information required to be disclosed by tax-exempt entities under § 6104. We conclude that these agreements constitute, at least in part, information required to be disclosed under § 6104.

8. There appears to be only one other federal case on this issue. In that case, also entitled *Tax Analysts v. IRS,* a district court, after conducting an *in camera* examination of the particular closing agreements sought to be disclosed, found that § 6103 prohibited their

case, Tax Analysts sought disclosure of a closing agreement between the IRS and the Christian Broadcasting Network ("CBN"), a tax-exempt entity. The IRS had audited CBN and examined its eligibility for tax-exempt status after the network allegedly engaged in impermissible political activities. Tax Analysts argued that because CBN was able to retain its tax-exempt status only after signing the closing agreement, the agreement constituted documentation in support of the exemption application that must be publicly disclosed pursuant to § 6104(a)(1)(A). Rejecting the IRS's argument that disclosure of closing agreements is categorically prohibited by § 6103, the D.C. Circuit held that judicial examination of such closing agreements is necessary to determine whether or not they might indeed constitute information in support of an application for tax exemption required to be disclosed under § 6104. 214 F.3d at 184. As the court stated with respect to the closing agreements at issue in that case:

> Precluding disclosure of a closing agreement, without regard to its content or circumstances, merely because it carries that particular label is ... inconsistent with the statutory inclusion [in the disclosure requirements for tax-exempt organizations] of "*any* papers submitted" and "*any* letter or document issued" [in connection with an application for tax exemption]. Particularly in this case, where[the evidence] suggests that the closing agreement and application for exempt status were part of a single, overall negotiation between the IRS and [the Christian Broadcasting Network], the IRS's rigid reliance on the type of

disclosure and that they did not fall within the provisions of § 6104. *Tax Analysts v. IRS*, 53

documents at issue rather than their content is questionable.

214 F.3d at 184.

■ We agree with the D.C. Circuit. Disclosure of closing agreements is not categorically prohibited by § 6103, which is subject to § 6104; in appropriate circumstances, disclosure may be required under § 6104 or otherwise. Similarly, we reject the notion that § 6103 prohibits the disclosure of the entire closing agreement whenever part of the agreement contains return information. We also conclude that there are several reasons why the closing agreement in the case before us likely is subject to disclosure, at least in substantial part. First, just as in the *Tax Analysts* case the settling of the Church of Scientology's tax liability through the closing agreement was required in order for the organization to regain the tax-exempt status it had previously lost. Therefore the closing agreement would appear to constitute documentation in support of the exemption application which must be publicly disclosed pursuant to § 6104(a)(1)(A). *See* Alison H. Eaton, *Can the IRS Overrule the Supreme Court?* 45 Emory L.J. 987, 987–89 (1996) (discussing the fact that, as part of the closing agreement, the main Church of Scientology regained the tax-exempt status it had lost in the 1960s). This is fully consistent with the already extensive disclosure generally required of tax-exempt organizations under § 6104: in this case, the publication of the Church of Scientology's application for tax-exempt status, which contains detailed financial information about the organization, including its revenues and expenses. I.R.C. § 6104(a)(1)(A); 26 C.F.R. 6104(d)–1; IRS Form 1023.

F.Supp.2d 449, 451, 453 (D.D.C.1999).

Second, public disclosure of agreements that affect not just one taxpayer or a discrete group of taxpayers, but a broad and indeterminate class of taxpayers with a large and constantly changing membership, is also necessary as a practical matter. In the case of the Church of Scientology agreement, there are potentially tens, if not hundreds, of thousands of taxpayers who were not parties to the agreement and must be informed of the nature of the tax deductions available to them.[9] Indeed, the IRS, likely in recognition of that fact, has itself already disclosed some of the terms of this agreement, further confirming its adoption of the position that policymaking closing agreements can and must be disclosed. *See* Letter from Derome O. Bratvold, Chief, Adjustments Branch, IRS, to petitioners Michael and Marla Sklar (Feb. 4, 1994) ER 32 ("The settlement agreement between the Internal Revenue Service and the Church of Scientology allows individuals to claim, as charitable contributions, 80 percent of the cast [sic] of qualified religious services.").[10]

Third, where a closing agreement sets out a new policy and contains rules of general applicability to a class of taxpayers, disclosure of at least the relevant part of that agreement is required in the interest of public policy. That this is the IRS's understanding as well is demonstrated by the fact that public disclosure has been a requirement contained in at least two such policymaking closing agreements. The IRS required publication of its closing agreement with Hermann Hospital of Houston, Texas, a tax-exempt entity, concluded following the hospital's disclosure to the IRS of certain physician recruitment practices which might have constituted prohibited transactions for a tax-exempt entity. John W. Leggett, *Physician Recruitment and Retention by Tax Exempt Hospitals: The Hermann Hospital Physician Recruitment Guidelines*, 8 Health Law. 1, 6 (Spring 1995). Under the closing agreement, the hospital was required to engage only in permissible physician recruitment activities, as detailed extensively in an attached set of "Guidelines." Leggett at *1–*3. Public disclosure of the closing agreement put other non-profit hospitals on notice of the IRS's definition of permissible physician recruitment activities.[11] That such was the purpose of requir-

---

9. Only the IRS and the Church of Scientology are parties to the alleged closing agreement, although it purports to address the tax liability of taxpayer *members* of the Church of Scientology.

10. In 1993, the Sklars filed an amendment to their 1991 tax return in which they claimed as a charitable contribution deduction the tuition paid for their children's religious education and requested an appropriate refund. Michael Sklar stated, "Pursuant to Revenue Ruling 93–73, Revenue Ruling 78–189 disallowing charitable contribution deductions for 'auditing' payments to the Church of Scientology, has been obsoleted. As it now appears that the I.R.S. is now allowing a charitable deduction for payments to qualified organizations which provide religious education, I have added payments to religious school to charitable contributions." ER 33–34. The IRS responded with the 1994 letter, cited

above, explaining the nature of the deduction permitted to members of the Church of Scientology pursuant to the closing agreement, and disallowing the refund to the Sklars as they had "provided no verification to show that nay [sic] of the amount claimed was for specified services." ER 32. For some reason, the IRS was apparently under the impression that the Sklars were Scientologists rather than Orthodox Jews.

11. *See* Robert C. Louthian III, and Elizabeth M. Mills, *Physician Recruitment after Hermann Hospital*, 4 Annals Health L. 1, *5–*6 (1995) (discussing the fact that IRS was well within its authority to require disclosure of the agreement and that although closing agreements have no legal precedential value, the Hermann Hospital closing agreement will likely affect both how tax-exempt hospitals conduct their affairs and how IRS agents

ing publication is clear from the fact that the agreement included provisions that did not apply to Hermann Hospital, but that might in the future be applicable to other tax-exempt hospitals. Leggett at *6 n. 35. Similarly, publication on the Internet was required of the IRS's closing agreement with the Kamehameha Schools Bishop Estate, a tax-exempt educational trust in Hawaii. The agreement was concluded after the IRS threatened to revoke the trust's tax-exempt status because the trustees had engaged in serious financial misconduct and self-dealing. Evelyn Brody, *A Taxing Time for the Bishop Estate: What is the I.R.S. Role in Charity Governance?*, 21 U. Haw. L. Rev. 537, 539–540 (1999). It required that the incumbent trustees be removed, that the estate pay a penalty of nine million dollars, and that future governance of the estate conform to the agreement's provisions, including restrictions on who could become trustees and a requirement that the estate make its financial records publicly available. Brody at 539–40. Because the IRS had not traditionally intervened to this extent in matters of estate governance, the publication of the closing agreement served to put the members of other trusts on notice that the failure to administer trusts along the lines that the IRS required of the Bishop Estate might lead to loss of tax-exempt status.[12] Here, there is a strong public interest in the disclosure of the contents of the IRS's

agreement with the Church of Scientology, especially as the agreement establishes a new policy governing charitable contributions to a particular religious organization which, while the pertinent statute may be unclear, clearly contravenes a prior Supreme Court holding.

▮ Therefore, we reject the argument that the closing agreement made with the Church of Scientology, or at least the portion establishing rules or policies that are applicable to Scientology members generally, is not subject to public disclosure. The IRS is simply not free to enter into closing agreements with religious or other tax-exempt organizations governing the deductions that will be available to their members and to keep such provisions secret from the courts, the Congress, and the public.[13]

## B. The Constitutionality of the IRS's Agreement with the Church of Scientology

The Supreme Court has developed a framework for determining whether a statute grants an unconstitutional denominational preference. Under that test, articulated in *Larson v. Valente*, 456 U.S. 228, 246–47, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), the first inquiry is whether or not the law facially discriminates amongst religions. The second inquiry, should it be

evaluate the activities of tax-exempt hospitals).

**12.** Evelyn Brody, *The Limits of Charity Fiduciary Law*, 57 Md. L. Rev. 1400, 1410–1411 & n. 49 (1998) ("Lately, perhaps responding to criticism that closing agreements create a secret body of law, some [IRS] regulators have conditioned settlement on the charity's assenting to public disclosure of the agreement.").

**13.** We believe that the Tax Court's ruling that the closing agreement is not relevant is in all likelihood correct. The Tax Court concluded

that the Sklars were not similarly situated to the members of the Church of Scientology who benefitted from the closing agreement. While we have no doubt that certain taxpayers who belong to religions other than the Church of Scientology would be similarly situated to such members, we think it unlikely that the Sklars are. Religious education for elementary or secondary school children does not appear to be similar to the "auditing" and "training" conducted by the Church of Scientology. *See* note 1, *supra*. Again, however, we need not resolve that issue here.

found that the law does so discriminate, is whether or not, applying strict scrutiny, that discrimination is justified by a compelling governmental interest. *Id.* Applying this test to the policy of the IRS towards the Church of Scientology, the initial inquiry must be whether the policy facially discriminates amongst religions. Clearly it does, as this tax deduction is available only to members of the Church of Scientology.

The second *Larson* inquiry is whether or not the facially discriminatory policy is justified by a compelling governmental interest. 456 U.S. at 246–47, 102 S.Ct. 1673. Although the IRS does not concede that it is engaging in a denominational preference, it asserts in its brief that the terms of the settlement agreement cannot be used as a basis to find an Establishment Clause violation because "in order to settle a case, both parties are required to make compromises with respect to points on which they believe they are legally correct." This is the only interest that the IRS proffers for the alleged policy. Although it appears to be true that the IRS has engaged in this particular preference in the interest of settling a long and litigious tax dispute with the Church of Scientology,[14] and as compelling as this interest might otherwise be, it does not rise to the level that would pass strict scrutiny. The benefits of settling a controversy with one religious organization can hardly outweigh the costs of engaging in a religious preference. Even aside from the constitutional considerations, a contrary rule would create a procedure by which any denomination seeking a denominational preference could bypass Congressional law-making and IRS rulemaking by engaging in voluminous tax litigation. Such a procedure would likely encourage the proliferation of such litigation, not reduce it. *Larson,* 456 U.S. at 248, 102 S.Ct. 1673 (holding that even assuming *arguendo* that the government has a compelling governmental interest for a denominational preference, it must show that the rule is "closely fitted to further the interest that it assertedly serves"). Because the facial preference for the Church of Scientology embodied in the IRS's policy regarding its members cannot be justified by a compelling governmental interest, we would, if required to decide the case on the ground urged by the Sklars, first determine that the IRS policy constitutes an unconstitutional denominational preference under *Larson,* 456 U.S. at 230, 102 S.Ct. 1673.

■ The Sklars contend that because "the IRS has admitted that it permits members of the Church of Scientology to deduct their payments for religious instruction . . . . in order to avoid violating the First Amendment, [the] IRS must permit adherents of other faiths to deduct their payments for religious instruction." To the extent that the Sklars claim that the Establishment Clause requires that we extend the Scientology deduction to all religious organizations, they are in error for three reasons: First, we would be reluctant ever to presume that Congress or any agency of the government would intend that a general religious preference be adopted, by extension or otherwise, as such preferences raise the highly sensitive issue of state sponsorship of religion. In the absence of a clear expression of such intent, we would be unlikely to consider extending a policy favoring one religion where the effect of our action would be to

---

**14.** *See* Alison H. Eaton, *Can the IRS Overrule the Supreme Court?* 45 Emory L.J. 987, 987–89 (1996) ("Since its inception the Church [of Scientology] has been embroiled in an endless stream of litigation with the Internal Revenue Service . . . [h]owever, in late 1993, a truce was called [by way of the Closing Agreement].").

create a policy favoring all. Second, the Supreme Court has previously stated that a policy such as the Sklars wish us to create would be of questionable constitutional validity under *Lemon*, because the administration of the policy could require excessive government entanglement with religion. *Hernandez*, 490 U.S. at 694, 109 S.Ct. 2136; *see Lemon*, 403 U.S. at 612–13, 91 S.Ct. 2105. Third, the policy the Sklars seek would appear to violate section § 170. *See Hernandez*, 490 U.S. at 692–93, 109 S.Ct. 2136. To the extent that the Sklars are also making an administrative inconsistency claim, we reject that claim on two grounds. First, in order to make an administrative inconsistency claim, a party must show that it is similarly situated to the group being treated differently by the agency. *United States v. Kaiser*, 363 U.S. 299, 308, 80 S.Ct. 1204, 4 L.Ed.2d 1233 (Frankfurter, J., concurring) ("The Commissioner [of the IRS] cannot tax one and not tax another without some rational basis for the difference. And so, … it can be an independent ground of decision that the Commissioner has been inconsistent. …"). We seriously doubt that the Sklars are similarly situated to the persons who benefit from the Scientology closing agreement because the religious education of the Sklars' children does not appear to be similar to the "auditing", "training" or other "qualified religious services" conducted by the Church of Scientology. Second, even if they were so situated, because the treatment they seek is of questionable statutory and constitutional validity under § 170 of the IRC, under *Lemon*, and under *Hernandez*, we would not hold that the unlawful policy set forth in the closing agreement must be extended to all religious organizations. In the end, however, we need not decide the Establishment Clause claim or the administrative inconsistency claim as the Sklars have failed to show that their tuition payments constitute a partially deductible "dual payment" under the Tax Code.

### III. The Sklars' Tuition Payments Do Not Constitute Partially Deductible "Dual Payments" Under the Tax Code

A "dual payment" (or "quid pro quo payment") under the Tax Code is a payment made in part in consideration for goods and services, and in part as a charitable contribution. I.R.C. § 6115. For example, the purchase, for seventy-five dollars, of an item worth five dollars at a charity auction would constitute a dual payment: five dollars in consideration for goods, and seventy dollars as a charitable contribution. The IRS permits a deduction under § 170 for the portion of a dual payment that consists of a charitable contribution, but not for the portion for which the taxpayer receives a benefit in return. Although the Sklars concede that they received a benefit for their tuition payments, in that their children received a secular education, they claim that part of the payment—the part attributable to their children's religious education—should be regarded as a charitable contribution because they received only an "intangible religious benefit" in return. Leaving aside both the issue, discussed in section I, of whether the tax code does indeed treat payments for which a taxpayer receives an "intangible religious benefit" as a charitable contribution, as well as any constitutional considerations, we are left with the Sklars' contention that their tuition payment was a dual one: in part in consideration for secular education, and in part as a charitable contribution. The Sklars assert that because 45% of their children's school day was spent on secular education, and 55% on religious education, they should receive a deduction for 55% of their tuition payments.

■ On the record before this court, the Sklars failed to satisfy the requirements for deducting part of a "dual payment" under the Tax Code. The Supreme Court discussed the deductibility of such payments in *United States v. American Bar Endowment*, 477 U.S. 105, 106 S.Ct. 2426, 91 L.Ed.2d 89 (1986), and held that the taxpayer must establish that the dual payment exceeds the market value of the goods received in return. The facts of that case were as follows: The American Bar Endowment ("ABE"), a tax-exempt corporation organized for charitable purposes and associated with the American Bar Association ("ABA"), raised money for its charitable work by providing group insurance policies to its members, all of whom were also members of the ABA. ABE negotiated premium rates with insurers, collected premiums from its members and passed those premiums on to the insurers. 477 U.S. at 107, 106 S.Ct. 2426. Because the group policies purchased by ABE were "experience rated," the group members were entitled to receive, each year, a refund of the portion of their premiums paid above the actual cost to the insurer of providing insurance to the group. *Id.* at 107–108, 106 S.Ct. 2426. Although normally these refunds, called "dividends," would be distributed to individual policyholders, ABE required its members to agree to turn the dividends over to ABE for use in its charitable work. *Id.* ABE members sought to deduct the dividends as charitable contributions to ABE, claiming that the premiums paid constituted partially deductible "dual payments." The Supreme Court held that the ABE members could not deduct the dividends as charitable contributions because

they had not shown that the premiums they paid to ABE exceeded the market value of the insurance they purchased, or that the "excess payment," if any, was made with the intention of making a gift. 477 U.S. at 117, 106 S.Ct. 2426. Because the ABE insurance was no more costly to its members than other policies that were available to them, the taxpayers could not prove that they "purposely contributed money or property in excess of the value of any benefit [they] received in return." 447 U.S. at 118, 100 S.Ct. 2051.

■ Similarly, the Sklars have not shown that any dual tuition payments they may have made exceeded the market value of the secular education their children received. They urge that the market value of the secular portion of their children's education is the cost of a public school education. That cost, of course, is nothing. The Sklars are in error. The market value is the cost of a comparable secular education offered by private schools. The Sklars do not present any evidence even suggesting that their total payments exceeded that cost. There is no evidence in the record of the tuition private schools charge for a comparable secular education, and thus no evidence showing that the Sklars made an "excess payment" that might qualify for a tax deduction. This appears to be not simply an inadvertent evidentiary omission, but rather a reflection of the practical realities of the high costs of private education. The Sklars also failed to show that they intended to make a *gift* by contributing any such "excess payment." Therefore, under the clear holding of *American Bar Endowment*, the Sklars cannot prevail on this appeal.[15]

---

15. Moreover, as the IRS argues in its brief, the Sklars' deduction was properly denied on the alternative ground that they failed to meet the contemporaneous substantiation requirement of § 170(f)(8)(A), (B) & (C). The Sklars did not present, prior to filing their tax return, a letter from the schools acknowledging their "contribution" and estimating the value

## IV. Conclusion

We hold that because the Sklars have not shown that their "dual payment" tuition payments are partially deductible under the Tax Code, and, specifically, that the total payments they made for both the secular and religious private school education their children received exceeded the market value of other secular private school education available to those children, the IRS did not err in disallowing their deductions, and the Tax Court did not err in affirming the IRS's decision. We affirm the decision of the Tax Court on that ground.

AFFIRMED.

SILVERMAN, Circuit Judge, concurring:

Why is Scientology training different from all other religious training? . We should decline the invitation to answer that question. The sole issue before us is whether the *Sklars'* claimed deduction is valid, not whether members of the Church of Scientology have become the IRS's chosen people.

The majority states that the Church of Scientology's closing agreement is not relevant because "the Sklars[are] not similarly situated to the members of the Church of Scientology. . . ." That may or may not be true, but it has no bearing on whether the tax code permits the Sklars to deduct the costs of their children's religious education as a charitable contribution. Whether the Sklars are entitled to the deduction they claim is governed by 26 U.S.C. § 170, *Hernandez v. Commissioner*, 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989), and *United States v. American Bar Endowment*, 477 U.S. 105, 106 S.Ct. 2426, 91 L.Ed.2d 89 (1986), not by the Church of Scientology closing agreement.

—Section 170 states that quid pro quo donations, for which a taxpayer receives something in return, are not deductible.

—*Hernandez* holds that § 170 applies to religious quid pro quo donations.

—*American Bar Endowment* holds that charitable donations are deductible only to the extent that they exceed the fair market value of what is received in exchange.

The Sklars receive something in return for their tuition payments—the education of their children. Thus, they are not entitled to a charitable deduction under § 170, as Judge Reinhardt carefully shows. *Hernandez* clearly forecloses the argument that § 170 should not apply because the tuition payments are for religious education. Finally, the Sklars have not demonstrated that what they pay for their children's education exceeds the fair market value of what they receive in return; therefore, they have not shown that they are entitled to a deduction under *American Bar Endowment*. It is as simple as that.

Accordingly, under both the tax code and Supreme Court precedent, the Sklars are not entitled to the charitable deduction they claimed. The Church of Scientology's closing agreement is irrelevant, not because the Sklars are not "similarly situated" to Scientologists, but because the closing agreement does not enter into the equation by which the deductibility of the Sklars' payments is determined. An IRS closing agreement cannot overrule Congress and the Supreme Court.

---

of the benefit they received, as is required under the statute. As noted earlier, certain reporting requirements are not applicable where intangible religious benefits are re-

ceived in exchange, but such exemptions apply only where the consideration consists *solely* of such benefits. See the discussion of § 170(f)(8) at p. 613, *supra*.

If the IRS does, in fact, give preferential treatment to members of the Church of Scientology—allowing them a special right to claim deductions that are contrary to law and rightly disallowed to everybody else—then the proper course of action is a lawsuit to stop to *that* policy.[1] The remedy is not to require the IRS to let others claim the improper deduction, too.

---

1.  *See Bowen v. Kendrick,* 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988) (allowing a taxpayer group to challenge the constitutionality of the Adolescent Family Life Act under the Establishment Clause); *School Dist. of City of Grand Rapids v. Ball,* 473 U.S. 373, 380 n. 5, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985) (noting and affirming "the numerous cases in which we have adjudicated Establishment Clause challenges by state taxpayers to programs for aiding nonpublic schools."), *rev'd on other grounds, Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).