**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL SKLAR; MARLA SKLAR,
        *Petitioners-Appellants,*

v.

COMMISSIONER OF INTERNAL
REVENUE,
        *Respondent-Appellee.*

No. 06-72961

Tax Ct. No.
395-01

OPINION

Appeal from a Decision of the United States Tax Court

Argued and Submitted
February 4, 2008—Pasadena, California

Filed December 12, 2008

Before: Harry Pregerson and Kim McLane Wardlaw,
Circuit Judges, and Ronald B. Leighton,* District Judge.

Opinion by Judge Wardlaw

---

*The Honorable Ronald B. Leighton, United States District Judge for
the Western District of Washington, sitting by designation.

**COUNSEL**

Jeffrey I. Zuckerman (argued), Curtis, Mallet-Prevost, Colt & Mosle, LLP, Washington, D.C., for the petitioners-appellants.

Ellen Page DelSole (argued), Eileen J. O'Connor, and Kenneth L. Greene, Department of Justice, Washington, D.C., for the respondent-appellee.

**OPINION**

WARDLAW, Circuit Judge:

Michael and Marla Sklar ("the Sklars") appeal from a decision of the Tax Court affirming the disallowance of deduc-

tions they claimed for tuition and fees paid to their children's Orthodox Jewish day schools. *See Sklar v. Comm'r*, 125 T.C. 281 (2005). We have jurisdiction pursuant to 28 U.S.C. § 7482(a)(1), and we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Taxpayers*

The Sklars are Orthodox Jews who in 1995 had five school-aged children. Rather than send their children to public school to meet California State educational requirements, the Sklars enrolled each of their children in one of two Orthodox Jewish day schools, Emek Hebrew Academy ("Emek") and Yeshiva Rav Isacsohn Torath Emeth Academy ("Yeshiva Rav"). They did so "because of their sincerely and deeply held religious belief that as Jews they have a religious obligation to provide their children with an Orthodox Jewish education in an Orthodox Jewish environment." In 1995, the Sklars paid a total of $27,283 to Emek and Yeshiva Rav which included $24,093 for tuition, $1300 for registration fees, $1715 for other mandatory fees, and $175 for an after school Mishna program at Emek.[1] During 1995, Emek and Yeshiva Rav each were exempt from federal income tax under I.R.C. § 501(c)(3), which provides tax exempt status for certain institutions "organized and operated exclusively for religious, charitable, . . . or educational purposes," among others. Both schools also qualified as organizations described in I.R.C. § 170(b)(1)(A), which allows donors to deduct charitable donations to qualifying institutions.

Both schools provided daily exposure to Jewish heritage and values. Their goals included educating their students in Jewish heritage and values, as well as the tenets of the Jewish faith. To this end, time was allocated in the school day for prayers and religious studies, students were required to adhere

---

[1]Mishna is the study of Jewish oral law.

to Orthodox Jewish dress codes, and boys and girls attended classes separately.

A child's day at each school included specified hours devoted to courses in religious studies and specified hours devoted to secular studies. The length of time that each student participated in secular classes, as opposed to religious studies, and the length of the total school day varied with the gender and grade level of the particular student.

Quality secular education that fulfilled the mandatory education requirements of the State of California also was a goal of both schools. Emek sought to provide a thorough and well-balanced curriculum in both religious and secular studies so that every student could succeed "in the most rigorous yeshiva [(Jewish)] high schools and other institutions of higher learning." Yeshiva Rav sought to prepare its students for matriculation to yeshiva high schools and to attend a college or seminary.

During the school years in issue, the Sklars paid tuition and mandatory fees to Emek and Yeshiva Rav for their children's education. To ensure payment, the Sklars, like other parents, were required to contract with each school to pay, and to give to each school postdated checks covering, the tuition for the upcoming school year. Both schools provided tuition discounts to families based on financial need, if documented by detailed financial information submitted to the schools' scholarship committees, but the Sklars did not seek or receive such assistance. Although an Orthodox Rabbinic ruling precluded either school from expelling students from the Jewish studies program during the school year, nonpayment of tuition could result in expulsion from secular studies and the schools' refusal to allow the children to register for classes in the subsequent school year.

## B. *The Prior Litigation*

In 1993, the Sklars learned of a confidential closing agreement[2] the Internal Revenue Service ("IRS") had executed with the Church of Scientology that purportedly allowed deductions for certain religious educational services such as auditing and training. The Sklars subsequently amended their tax returns for 1991 and 1992, and filed a return for 1993, including new deductions for a portion of the tuition they had paid to their children's schools. *See Sklar*, 125 T.C. at 288. The IRS allowed these deductions, apparently under the impression that the Sklars were Scientologists. *See id.* The Sklars claimed similar deductions in 1994, but these were disallowed. *Id.* at 288-89. The IRS Notice of Deficiency explained that because the costs were for personal tuition expenses, they were not deductible. The Sklars pursued an unsuccessful petition for redetermination before the Tax Court regarding their 1994 deductions, which subsequently came before us. Judge Reinhardt, writing for our Court in an opinion joined by Judge Pregerson, upheld the Tax Court's denial of the deduction. *See Sklar v. Comm'r* (*Sklar I*), 282 F.3d 610 (9th Cir. 2002), *amending and superseding Sklar v. Comm'r*, 279 F.3d 697 (9th Cir. 2002).

In *Sklar I*, the Sklars made virtually identical arguments to those they assert here, based predominantly on their theories that a portion of their tuition payments are tax deductible because they received in exchange only intangible religious benefits and the Scientology Closing Agreement is an uncon-

---

[2]Under § 7121 of the Internal Revenue Code, the IRS is authorized to execute "closing agreements." A closing agreement is "an agreement in writing with any person relating to the liability of such person (or of the person or estate for whom he acts) in respect of any internal revenue tax for any taxable period." I.R.C. § 7121(a); *see also* 26 C.F.R. § 301.7121-1. Such closing agreements are intended to be "final and conclusive, and, except upon a showing of fraud or malfeasance, or misrepresentation of a material fact," shall not be reopened or annulled. I.R.C. § 7121(b).

stitutional establishment of religion from which they should also benefit.

The *Sklar I* panel soundly rejected the Sklars' argument that certain 1993 amendments to the Tax Code rendered their tuition payments deductible as payments to exclusively religious organizations for which the Sklars received only intangible religious benefits. 282 F.3d at 612-14. Specifically, the panel noted that the amendments addressed "clearly procedural provisions" and that the deduction the Sklars alleged would be "of doubtful constitutional validity." *Id.* at 613.

Next, the *Sklar I* panel held that the IRS was compelled to disclose the contents of its Closing Agreement with the Church of Scientology, at least to the extent it fell under I.R.C. § 6104(a)(1)(A), *see* 282 F.3d at 614-18, and that such disclosure was necessary as a practical matter because the agreement affects "not just one taxpayer or a discrete group of taxpayers, but a broad and indeterminate class of taxpayers with a large and constantly changing membership." *Id.* at 617. Further, the panel held "where a closing agreement sets out a new policy and contains rules of general applicability to a class of taxpayers, disclosure of at least the relevant part of that agreement is required in the interest of public policy." *Id.* In *Sklar I*, the panel therefore rejected

> the argument that the closing agreement made with the Church of Scientology, or at least the portion establishing rules or policies that are applicable to Scientology members generally, is not subject to public disclosure. The IRS is simply not free to enter into closing agreements with religious or other tax-exempt organizations governing the deductions that will be available to their members and to keep such provisions secret from the courts, the Congress, and the public.

*Id.* at 618. The *Sklar I* panel nevertheless opined, without resolving the issue, that the Tax Court's ruling that the Clos-

ing Agreement was irrelevant to the deductibility of the Sklars' tuition payments was "in all likelihood correct." *Id.* It continued:

> The Tax Court concluded that the Sklars were not similarly situated to the members of the Church of Scientology who benefitted from the closing agreement. While we have no doubt that certain taxpayers who belong to religions other than the Church of Scientology would be similarly situated to such members, we think it unlikely that the Sklars are. Religious education for elementary or secondary school children does not appear to be similar to the "auditing" and "training" conducted by the Church of Scientology.

*Id.* at 618 n.13; *see also Hernandez v. Comm'r*, 490 U.S. 680, 684-85 (1989) (describing "auditing" and "training").

The *Sklar I* panel then turned to the Sklars' Establishment Clause and administrative consistency arguments. Although it was not required to decide those issues because the Sklars had "failed to show that their tuition payments constitute a partially deductible 'dual payment' under the Tax Code," *Sklar I*, 282 F.3d at 620, the panel noted that had it been required to do so, it would have first concluded that the IRS policy constitutes an unconstitutional denominational preference under *Larson v. Valente*, 456 U.S. 228 (1982).[3] *See Sklar I*,

---

[3]*Larson v. Valente* established an analytical framework to assess the constitutionality of statutes granting denominational preferences. 456 U.S. 228, 245-52 (1982). To survive an Establishment Clause challenge under *Larson*, a statute which grants a denominational preference must be justified by a "compelling governmental interest" to which it is "closely fitted." *Id.* at 247-48, 252; *see also id.* at 246 ("[T]his Court has adhered to the principle, clearly manifested in the history and logic of the Establishment Clause, that no State can pass laws which aid one religion or that prefer one religion over another." (internal citation and quotation marks omitted)).

282 F.3d at 618-19. The panel reasoned that the denominational preference embodied in the Closing Agreement was unconstitutional because it "cannot be justified by a compelling governmental interest." *Id.* However, the panel indicated it would not be willing to extend that preference to other religious organizations for three reasons: First, an extension of the preference would amount to state sponsorship of all religions, which the panel doubted "Congress or any agency of the government would intend." *Id.* at 619-20. Second, an extension of the preference would be "of questionable constitutional validity under *Lemon*,"[4] because administering the policy "could require excessive government entanglement with religion."[5] *Id.* at 620. Third, the requested policy violated appeared to violate I.R.C. § 170. *Id.*

The panel also indicated it would reject the Sklars' administrative consistency claim because it "seriously doubted" that the Sklars were similarly situated to the Scientologists.[6] The

---

[4]In *Lemon v. Kurtz*, 403 U.S. 602 (1971), the Supreme Court established a three-prong test to determine whether the state has violated the Establishment Clause: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion." *Id.* at 612-13 (1971) (internal citations and quotation marks omitted).

[5]In *Hernandez v. Commissioner*, 490 U.S. 680 (1989), the Supreme Court rejected the claim that payments made to the Church of Scientology for purely religious education and training were deductible as gifts or contributions under I.R.C. § 170. *Id.* at 692-94. Among other reasons it gave for its decision, the Court explained that "the deduction petitioners seek might raise problems of entanglement between church and state." *Id.* at 694; *see also infra* Part II.B (discussing § 170 and *Hernandez*).

[6]Judge Silverman, concurring, concluded that the question of whether the Sklars were "similarly situated" to the Scientologists had "no bearing on whether the tax code permits the Sklars to deduct the costs of their children's religious education as a charitable contribution." *Sklar I*, 282 F.3d at 622. Rather, he concluded that the Sklars were absolutely barred from taking the deduction by the Internal Revenue Code and Supreme Court precedent. *See id.* at 622-23.

panel further stated that even if the Sklars were similarly situated, "because the treatment they seek is of questionable statutory and constitutional validity under § 170 of the IRC, under *Lemon*, and under *Hernandez*, we would not hold that the unlawful policy set forth in the closing agreement must be extended to all religious organizations." *Id.* at 620.

Finally, relying on *United States v. American Bar Endowment*, 477 U.S. 105 (1986), the *Sklar I* panel rejected the argument that the Sklars' tuition payments were deductible as a "dual payment" or "quid pro quo payment," a payment made in part as consideration for goods and services and in part for charitable purposes. In *American Bar Endowment*, the Supreme Court held that the taxpayer must satisfy a two-part test to be entitled to the § 170 deduction for a quid pro quo payment:

> First, the payment is deductible only if and to the extent it exceeds the market value of the benefit received. Second, the excess payment must be made with the intention of making a gift.

477 U.S. at 117 (internal citation and quotation marks omitted). The *Sklar I* panel held that the Sklars failed to introduce evidence demonstrating both "that any dual tuition payments they may have made exceeded the market value of the secular education their children received," 282 F.3d at 621, or "that they intended to make a *gift* by contributing such 'excess payment.'" *Id.* The panel also suggested that for the purpose of demonstrating the first part of the *American Bar Endowment* test, the "market value" for the tuition payments would be the cost of a comparable secular education offered by private schools, evidence the Sklars had failed to introduce, perhaps, because of the "practical realities of the high cost of education." *Id.*

## C.  *The Current Litigation*

On their 1995 tax return, the Sklars claimed $15,000 in deductions for purported charitable contributions that com-

prised a portion of their five children's tuition at Emek and Yeshiva Rav. The deduction was based on their estimate that 55% of the tuition payments were for purely religious education, an estimate supported by letters submitted two years later (in 1997) that were drafted by each of the schools at the Sklars' request. *Sklar*, 125 T.C. at 288-89.

The IRS disallowed the $15,000 deduction. The IRS also determined the Sklars had "failed to meet the substantiation requirements of Internal Revenue Code Section 170(f)(8) with respect to the disallowed $15,000.00 of claimed charitable contributions." The Sklars petitioned the Tax Court for a redetermination of deficiency, asserting that (1) the tuition and fee payments to exclusively religious schools are deductible under a dual payment analysis to the extent the payments exceeded the value of the secular education their children received (a question left somewhat open in *Sklar I*); (2) Sections 170(f)(8) and 6115 of the Internal Revenue Code, as enacted in 1993, authorized the deduction of tuition payments for religious education made to exclusively religious schools (an issue all but foreclosed by *Sklar I*); and (3) that the 1993 Closing Agreement between the Commissioner and the Church of Scientology constitutionally and administratively requires the IRS to allow other taxpayers to take the same charitable deductions for tuition payments to their religious schools (a question the panel discussed at length but declined to decide in *Sklar I*). Before the Tax Court, the Sklars and the IRS stipulated that in 1993 the IRS had executed a confidential closing agreement with the Church of Scientology, settling several outstanding issues between the IRS and the Church of Scientology. *See id.* at 298. Under this agreement, members of the Church of Scientology were authorized to deduct as charitable contributions at least 80% of the fees for qualified religious services provided by the Church of Scientology. *See id.* at 298-99.

The Tax Court again rejected the Sklars' arguments, holding that the tuition and fee payments to the Jewish Day

Schools were not deductible under any of the Sklars' theories.[7] First, the Tax Court rejected the Sklars' effort to prove that the tuition and fee payments so exceeded the market value of the secular education their children received that they took on a "dual character," *i.e.* that the payments had the character of both a purchase of education and a charitable contribution. *Id.* at 291-94; *see also American Bar Endowment*, 477 U.S. at 117. It found that the Sklars' expert report regarding tuition at various Los Angeles area schools demonstrated only that

> (1) Some schools charge more tuition than Emek and Yeshiva Rav Isacsohn, and some charge less; and (2) the amount of tuition petitioners paid is unremarkable and is not excessive for the substantial benefit they received in exchange; i.e., an education for their children.

125 T.C. at 293-94. The Tax Court concluded that the Sklars failed to demonstrate that any part of their tuition payments was intended as a charitable contribution and that the well-established law precluding deduction of tuition payments to schools providing both secular and religious education controlled. Second, the Tax Court held that the 1993 amendments to the Code "did not change what is deductible under section 170." *Id.* at 296-97. In keeping with our reasoning in *Sklar I*, the Tax Court concluded that neither § 170(f)(8), nor § 6115, as amended in 1993, nor the accompanying legislative history suggested that Congress intended to make a substantive change to the Code or to overrule the "long line of cases" precluding deductibility of tuition payments to religious schools. *Id.* at 296. Third, the Tax Court held that the Closing Agreement between the IRS and the Church of Scientology is irrelevant to the question of whether the Sklars are entitled to the § 170 deductions. *Id.* at 299. Finally, the Tax Court concluded

---

[7]The Tax Court also ruled that the Sklars were not liable for an accuracy-related penalty the IRS had imposed under I.R.C. § 6662, an issue not before us on this appeal.

that the Sklars' separate payments for Mishna classes, which were held apart from other classes at Emek, should not be treated any differently than the tuition and fee payments. The Sklars timely appeal.

## II.  DISCUSSION

### A.  *Standard of Review*

"We review the Tax Court's conclusions of law and its construction of the tax code de novo, and no deference is owed that court on its application of the law." *Sklar I*, 282 F.3d at 612. We review the Tax Court's factual determinations for clear error and its evidentiary rulings for abuse of discretion. *See Sparkman v. Comm'r*, 509 F.3d 1149, 1155-56 (9th Cir. 2007).

### B.  *The Sklars' 1995 Tuition Payments Are Not Deductible as Charitable Contributions Under the Internal Revenue Code*

[1] Section 170 of the Internal Revenue Code allows taxpayers to deduct "any charitable contribution," defined as "a contribution or gift to or for the use of" certain eligible entities enumerated in § 170(c), including those exclusively organized for religious purposes and educational purposes. I.R.C. § 170(a)(1), (c). "[T]o ensure that the payor's primary purpose is to assist the charity and not to secure some benefit," we require such contributions to be "made for detached and disinterested motives." *Graham v. Comm'r*, 822 F.2d 844, 848 (9th Cir. 1987). Therefore, "quid pro quo" payments, where the taxpayer receives a benefit in exchange for the payment, are generally not deductible as charitable contributions. *See Hernandez v. Comm'r*, 490 U.S. 680, 689-91 (1989). In keeping with this framework, tuition payments to parochial schools, which are made with the expectation of a substantial benefit, or quid pro quo, "have long been held not to be charitable contributions under § 170." *Id.* at 693; *see also DeJong*

*v. Comm'r*, 309 F.2d 373, 376 (9th Cir. 1962) ("The law is well settled that tuition paid for the education of the children of a taxpayer is a family expense, not a charitable contribution to the educating institution.").

**[2]** In *Hernandez*, the Supreme Court considered "whether taxpayers may deduct as charitable contributions payments made to branch churches of the Church of Scientology"[8] in return for services known as "auditing" and "training." 490 U.S. at 684. Both are considered forms of religious education. "Auditing" involves a form of spiritual counseling whereby a person gains spiritual awareness in one-on-one sessions with an auditor. By participating in "training," a person studies the tenets of Scientology, gains spiritually, and may seek to become an auditor. Members of the Church of Scientology sought to deduct payments for auditing and training as charitable contributions for religious services. The Court held that such payments for religious educational services "do not qualify as 'contribution[s] or gift[s].' " *Id.* at 691. Rather, "[t]hese payments were part of a quintessential *quid pro quo* exchange: in return for their money, petitioners received an identifiable benefit, namely, auditing and training sessions." *Id.* The Court reasoned " '[t]he *sine qua non* of a charitable contribution is a transfer of money or property *without adequate consideration*.' " *Id.* (quoting *American Bar Endowment*, 477 U.S. at 118).

**[3]** The Court further rejected the taxpayers' argument that a quid pro quo analysis was not even appropriate, because the

---

[8]In *Hernandez*, the Commissioner had stipulated before the Tax Court that "the branch churches of Scientology are religious organizations entitled to receive tax-deductible charitable contributions under the relevant sections of the Code." 490 U.S. at 686. This stipulation isolated the statutory issue of "whether payments for auditing or training sessions constitute 'contribution[s] or gift[s]' under § 170." *Id.* Similarly, the parties to the current litigation stipulated before the Tax Court "that an agreement dated October 1, 1993, between the Commissioner and the Church of Scientology settled several longstanding issues." 125 T.C. at 298.

payments for auditing and training services resulted in receipt of a purely religious benefit. *Id.* at 692-93. The Court first found no support in the language of § 170, which makes "no special preference for payments made in the expectation of gaining religious benefits or access to a religious service." *Id.* at 693. Second, the Court reasoned that accepting the taxpayers' "deductibility proposal would expand the charitable contribution deduction far beyond what Congress has provided." *Id.* at 693. For example, "some taxpayers might regard their tuition payments to parochial schools as generating a religious benefit or as securing access to a religious service," which would be incorrect because "such payments . . . have long been held not to be charitable contributions under § 170." *Id.* Finally, the Court noted that "the deduction petitioners seek might raise problems of entanglement between church and state" because it would "inexorably force the IRS and reviewing courts to differentiate 'religious' benefits from 'secular' ones." *Id.* at 694. While declining to pass on the constitutionality of such hypothetical inquiries, the Court noted that " 'pervasive monitoring' for 'the subtle or overt presence of religious matter' is a central danger against which we have held the Establishment Clause guards." *Id.* (quoting *Aguilar v. Felton*, 473 U.S. 402, 413 (1985)). Thus, the *Hernandez* decision clearly forecloses the Sklars' argument that there is an exception in the Code for payments for which one receives purely religious benefits.

### 1. *The 1993 Amendments to the Tax Code Did Not Overrule* Hernandez

To circumvent *Hernandez*'s clear holding, the Sklars resurrect their *Sklar I* argument that the 1993 amendments to IRS §§ 170(f)(8) and 6115 overruled the Court's holding in *Hernandez* that only gifts or contributions may be deducted under § 170. According to the Sklars, the 1993 amendments provide for the deduction of tuition payments for which they receive only intangible religious benefits. We agree with the Tax

Court that the Sklar's interpretation of the 1993 amendments is misguided.

[4] Amended § 170(f)(8) requires the taxpayer to "substantiate[ ] the contribution by a contemporaneous written acknowledgment of the contribution by the donee organization." I.R.C. § 170(f)(8)(A). This acknowledgment must include an estimate of the value of any goods or services the donor received in exchange, "or, if such goods or services consist solely of intangible religious benefits, a statement to that effect." I.R.C. § 170(f)(8)(B)(iii). The amendment also defines an "intangible religious benefit" as one "which is provided by an organization organized exclusively for religious purposes and which generally is not sold in a commercial transaction outside the donative context." *Id.* As the Tax Court correctly held, *Sklar*, 125 T.C. at 296-97, and as we have previously suggested, *Sklar I*, 282 F.3d at 613, this amendment creates an exception only to the new substantiation requirement created by § 170(f)(8)(A).[9] Nothing in the amendment's language suggests that Congress intended to expand the types of payments that are deductible contributions. As the *Sklar I* panel explained:

---

[9]Although the Sklars rely on the new substantiation requirement as support for their deduction of tuition payments, they did not fully comply with the requirement themselves. Section 170(f)(8)(C) requires that substantiation be provided by the earlier of (1) the date on which the return is filed or (2) the due date for filing the return. However, the Sklars did not submit the required supporting documentation until November 1997. The IRS argues that this untimely substantiation should serve as an absolute bar to the Sklars' claimed deductions. However, some of the Sklars' deductions, such as payments for Mishna classes, were not subject to the substantiation requirement because they fell below the $250 threshold described in section 170(f)(8). "Separate contributions of less than $250 are not subject to the requirements of section 170(f)(8), regardless of whether [they sum up to] $250 or more." 26 C.F.R. § 1.170A-13(f)(1) (as amended in 1996). Because we conclude that no part of the Sklars' payments were deductible, we need not reach the issue.

Given the clear holding of *Hernandez* and the absence of any direct evidence of Congressional intent to overrule the Supreme Court on this issue, we would be extremely reluctant to read an additional and significant substantive deduction into the statute based on what are clearly procedural provisions regarding the documentation of tax return information, particularly where the deduction would be of doubtful constitutional validity.

*Id.*

**[5]** The second pertinent 1993 amendment requires donee organizations to disclose limitations on the deductibility of certain quid pro quo payments to the donors of such payments. *See* I.R.C. § 6115. Amended § 6115(a) requires any organization that "receives a quid pro quo contribution in excess of $75" to provide the donor with a written statement declaring that the deductible portion of the contribution cannot include "the value of the goods or services provided by the organization," along with "a good faith estimate of the value of such goods or services." However, § 6115(b) explains:

*For purposes of this section*, the term "quid pro quo contribution" means a payment made partly as a contribution and partly in consideration for goods or services provided to the payor by the donee organization. A quid pro quo contribution does not include any payment made to an organization, organized exclusively for religious purposes, in return for which the taxpayer receives solely an intangible religious benefit that generally is not sold in a commercial transaction outside the donative context.

I.R.C. § 6115(b) (emphasis added). The Sklars read the exemption from the disclosure requirement for organizations organized exclusively for religious purposes which provide

solely an intangible religious benefit completely out of context. The *Sklar I* panel explained why the Sklars' reading of the exemption is unsupportable:

> [Section] 6115 requires that tax-exempt organizations inform taxpayer-donors that they will receive a tax deduction only for the amount of their donation above the value of any goods or services received in return for the donation and requires donee organizations to give donors an estimate of this value, exempting *from this estimate requirement* contributions for which solely intangible religious benefits are received.

282 F.3d at 613.

Nor does the legislative history of these amendments even mention *Hernandez*, and the House Report specifically states that, although the new requirements apply only to quid pro quo contributions for *commercial* benefits, "[n]o inference is intended . . . [regarding] whether or not any contribution outside the scope of the bill's substantiation or reporting requirements is deductible (in full or in part) under the present-law requirements of section 170." H.R. Rep. No. 103-111, at 786 n.170 (1993), *reprinted in* 1993 U.S.C.C.A.N. 378, 1017 n.170. Thus, the House Report confirms that Congress intended to preserve the status quo ante, and hardly serves as support for the Sklars' argument.[10]

---

[10]In light of certain well-established deductible payments to religious organizations in exchange for intangible religious benefits, such as pew rents and church dues, *see Hernandez*, 490 U.S. at 701-02, it seems plausible that Congress contemplated these sorts of contributions in amending §§ 170(f)(8) and 6115 in a manner that did not impose the arduous task of valuing the intangible religious benefits, such as the ability to participate in religious celebrations, that donors receive in exchange for these contributions.

**[6]** To put to rest the Sklars' statutory claim, we now hold that neither the plain language of the 1993 amendments nor the accompanying legislative history indicates any substantive change to *Hernandez*'s holding that payment for religious education to religious organizations is not deductible. We agree with the observation of both the Tax Court and the *Sklar I* panel that had Congress intended to overrule judicial precedent and to provide charitable contributions for tuition and fee payments to religious organizations that provide religious education, it would have expressed its intention more clearly. *See* 282 F.3d at 613; 125 T.C. at 296-97.

### 2. *The Tuition Payments Were Not "Dual Payment" Contributions*

**[7]** The Tax Court correctly concluded that no part of the Sklar's tuition payments is deductible under a "dual payment" analysis. *See Sklar*, 125 T.C. at 290-94, 299-300. In *American Bar Endowment*, the Supreme Court considered the question of the extent to which payments to organizations that bear the "dual character" of a purchase and a contribution are deductible under § 170. 477 U.S. at 116-18. IRS Revenue Ruling 67-246 had set forth a two-part test for determining the extent to which such payments are deductible:

> First, the payment is deductible only if and to the extent it exceeds the market value of the benefit received. Second, the excess payment must be "made with the intention of making a gift."

*Id.* at 117 (quoting Rev. Rul. 67-246, 1967-2 Cum. Bull. 104, 105 (1967)). The Court held that Revenue Ruling 67-246 embodied the proper standard, reasoning: "The *sine qua non* of a charitable contribution is a transfer of money or property without adequate consideration. The taxpayer, therefore, must at a minimum demonstrate that he purposely contributed money or property in excess of the value of any benefit he received in return." *Id.* at 118.

In *American Bar Endowment*, taxpayer members of a charitable organization sought to deduct under § 170 refunds from insurance policies negotiated and purchased on their behalf by the charitable organization, which they donated to the organization. *See id.* at 106-09, 116-18. They claimed that the premiums paid for the insurance, part of which was subsequently refunded due to the "experience rating" of the policies, were dual payments. *Id.* The Supreme Court held that the taxpayer members met neither prong of the two-part test for deductibility of dual payments. Stating that the "most logical test of the value of the insurance [the benefit received in return for their payment] is the cost of similar policies," the Court held that because three of the four taxpayers "failed to demonstrate that they could have purchased similar policies for a lower cost," they failed to demonstrate that their payment exceeded the market value of the benefit received. *Id.* at 118. Because the fourth taxpayer, who did prove that there was a comparable insurance program at a lower premium rate for which he was eligible, failed to demonstrate that he knew about the available lower premium during the tax years at issue, the Court held that he failed the second prong of the test—"that he intentionally gave away more than he received." *Id.*

**[8]** The Sklars again have failed to meet their burden of satisfying either prong of the two-part test for a dual payment, and we seriously doubt that they could ever make the showing that would support a "dual payment" deduction for tuition for combined religious and secular education.[11] In *Sklar I*, the panel concluded that the Sklars failed to satisfy the requirements for partial deductibility of their tuition payments. Our analysis has not changed, despite the Sklars' effort to introduce evidence as to market value.

---

[11]Indeed, the Tax Court expressed skepticism as to whether a dual payment analysis would ever be appropriate in this context. *See* 125 T.C. at 293 ("[M]ore fundamentally, the record speaks to whether a dual payments analysis applies in this case at all.").

**[9]** First, the *Sklar I* panel reasoned that the Sklars "failed to show that they intended to make a *gift* by contributing any such 'excess payment.' " 282 F.3d at 621. In fact, the Sklars have never even *argued*—not in *Sklar I*, not before the Tax Court and not before us—that they intended to make a gift as a portion of their tuition payment. Indeed, the record is to the contrary. In their brief, the Sklars explain at length that they pay the tuition and fees to send their children to Orthodox Jewish schools because it is a religious imperative of Orthodox Judaism. They "sent their children to Yeshiva Rav Isacsohn and Emek in 1995 because of their sincerely and deeply held religious belief that as Jews they have a religious obligation to provide their children with an Orthodox Jewish education in an Orthodox Jewish environment." Because they paid for religious education out of their own deeply held religious views, and because the record demonstrates that throughout the school day—during recess, lunch and secular, as well as religious, classes—the schools inculcate their children with their religion's lifestyle, heritage, and values, the Sklars have actually demonstrated the absence of the requisite charitable intent.

Second, the *Sklar I* panel reasoned that "the Sklars have not shown that any dual tuition payments they may have made exceeded the market value of the secular education their children received." *Id.* The panel stated that the Sklars needed to present evidence that their total payments exceeded "[t]he market value [of] the cost of a comparable secular education offered by private schools." *Id.* Before the Tax Court, the Sklars introduced expert testimony asserting that "Catholic schools are the most reasonable comparison benchmarks for the schools attended by the Sklar children." Based on his estimation of tuition paid for Archdiocesan Catholic schools[12] in

---

[12]The flaws in the expert report itself are too numerous to mention, but we point out only one: the archdiocesan schools are subsidized in large measure by the parishes in the Archdiocese in order to force down the costs of education and to afford all Catholic children the opportunity to attend Catholic schools. Thus, by choosing archdiocesan schools as the basis for his comparative market value, the Sklars' expert guaranteed that the tuition and fees paid to the Sklars' schools would greatly exceed the tuition at the archdiocesan Catholic schools.

Los Angeles County in 1995, the Sklars' expert concluded that the market value of the secular education the Sklars' children received was between $1483 and $1724, such that in 1995 the Sklars made "excess payments" of almost $5000 per child. The Sklars' expert also included tuition data for other Los Angeles schools in his report. The Tax Court correctly concluded that the evidence in the record indicated: "(1) Some schools charge more tuition than Emek and Yeshiva Rav Isacsohn, and some charge less; and (2) the amount of tuition petitioners paid is unremarkable and is not excessive for the substantial benefit they received in exchange; i.e., an education for their children." 125 T.C. at 293-94. Before us, the Sklars have failed to demonstrate—or even argue on appeal—that the Tax Court's factual findings as to the data set forth in their expert's report are clearly erroneous.

[10] Thus, the Tax Court did not err by concluding that the Sklars failed to show that any part of their tuition fees was a charitable deduction, subject to a dual payment analysis. We conclude that under *Hernandez* and the Internal Revenue Code, their tuition and fee payments must be treated like any other quid pro quo transaction, even if some part of the benefit received was religious in nature. *See* 490 U.S. at 691-94. We therefore agree with the Tax Court that the Sklars' tuition is not deductible, in whole or in part, under § 170.

## C.   *The 1993 Closing Agreement Does Not Constitutionally and Administratively Require the IRS To Allow Charitable Deductions for the Sklars' Tuition Payments to Religious Schools*

The Sklars reassert their *Sklar I* argument that in light of allegedly similar deductions allowed for members of the Church of Scientology under a closing agreement with the IRS, the disallowance of deductions for Orthodox Jewish religious education violates the Establishment Clause and principles of administrative consistency. They also argue that the Tax Court abused its discretion in denying discovery about

the Closing Agreement, including compelling its production.[13] Before the Tax Court, the Sklars and the Commissioner "stipulated that an agreement dated October 1, 1993, between the Commissioner and the Church of Scientology settled several longstanding issues." 125 T.C. at 298. A letter the Sklars had received from the IRS was also admitted. It established that the Closing Agreement "allows individuals to claim, as charitable contributions, 80 percent of the cost of qualified religious services." *Id.* The Sklars argued that because of the Closing Agreement, the Commissioner is constitutionally and administratively precluded from disallowing their deductions for school tuition and fees, which they contend are "jurisprudentially indistinguishable" from the auditing and training provided by the Church of Scientology.

The Tax Court correctly dispatched that argument by citing to *Sklar I. See* 125 T.C. at 299. There the panel stated that "[w]e seriously doubt that the Sklars are similarly situated to the persons who benefit from the Scientology closing agreement because the religious education of the Sklars' children does not appear to be similar to the 'auditing', 'training' or other 'qualified religious services' conducted by the Church of Scientology." 282 F.3d at 620; *see also id.* at 618 n.13. We also conclude that tuition and fee payments to schools that provide secular and religious education as part of one curriculum are quite different from payments to organizations that provide exclusively religious services. Because the Sklars are situated differently than members of the Church of Scientology, the Tax Court did not abuse its discretion in determining that the Closing Agreement itself was not relevant, and therefore not discoverable in the Sklars' redetermination proceedings.

---

[13]The Sklars made several efforts to obtain the Closing Agreement. The IRS repeatedly objected and sought protective orders on grounds of relevance and in reliance on I.R.C. § 6103, which makes confidential certain taxpayer "return information," including closing agreements. The Tax Court sustained the IRS's objections, without disclosing its reasoning, and the document was not admitted into evidence.

**[11]** Nor did the Tax Court err in its conclusion that "the agreement reached between the [IRS] and the Church of Scientology does not affect the result in this case," *Sklar v. Comm'r*, 125 T.C. at 299, because "the analysis in [*American Bar Endowment*] controls here." *Id.* (internal citation omitted). The *Sklar I* panel previously assumed the contents of the Closing Agreement, with reference to a Wall Street Journal article that purported to reprint the agreement in full. *See Sklar I*, 282 F.3d at 615; *Scientologists and IRS Settle for $12.5 Million*, Wall St. J., Dec. 30, 1997, at A12; agreement reprinted in Wall St. J. Interactive Edition (www.wsj.com). The panel also held that the IRS must make the Closing Agreement publicly available.[14] 282 F.3d at 614-18. The *Sklar I* panel further presumed from the IRS's failure to disclose that the terms of the Closing Agreement were as set forth in the Wall Street Journal article, and concluded that the Closing Agreement constitutes an unconstitutional denominational preference. *Id.* at 619. We cannot improve upon the original panel majority's elucidation of the principles at stake:

> Applying [*Larson v. Valente*, 456 U.S. at 246-47,] to the policy of the IRS towards the Church of Scientology, the initial inquiry must be whether the policy facially discriminates amongst religions. Clearly it does, as this tax deduction is available only to members of the Church of Scientology.

---

[14]In *Sklar I*, we held that closing agreements "constitute, at least in part, information required to be disclosed under § 6104," 282 F.3d at 615 n.7, and that "in appropriate circumstances, disclosure may be required under § 6104 or otherwise," *id.* at 616. Section 6104 of the Code compels certain 501(c) and 501(d) organizations to disclose any documents submitted in support of an application for exemption. However, § 6103 prohibits the disclosure of closing agreements and other confidential "return information." *Id.* Considering the interaction of the two sections, we held that "§ 6103 does not categorically prohibit the disclosure of closing agreements," but on the contrary "the disclosure prohibitions of § 6103 are subject to the mandatory disclosure requirements of § 6104." *Id.* Our holding in *Sklar I* is binding here, although we do not decide the extent to which the Closing Agreement might be discoverable in an appropriate forum.

The second *Larson* inquiry is whether or not the
facially discriminatory policy is justified by a com-
pelling governmental interest. 456 U.S. at 246-47,
102 S. Ct. 1673. Although the IRS does not concede
that it is engaging in a denominational preference, it
asserts in its brief that the terms of the settlement
agreement cannot be used as a basis to find an Estab-
lishment Clause violation because "in order to settle
a case, both parties are required to make compro-
mises with respect to points on which they believe
they are legally correct." This is the only interest that
the IRS proffers for the alleged policy. Although it
appears to be true that the IRS has engaged in this
particular preference in the interest of settling a long
and litigious tax dispute with the Church of Scien-
tology, and as compelling as this interest might oth-
erwise be, it does not rise to the level that would pass
strict scrutiny. The benefits of settling a controversy
with one religious organization can hardly outweigh
the costs of engaging in a religious preference. Even
aside from the constitutional considerations, a con-
trary rule would create a procedure by which any
denomination seeking a denominational preference
could bypass Congressional law-making and IRS
rulemaking by engaging in voluminous tax litigation.
Such a procedure would likely encourage the prolif-
eration of such litigation, not reduce it. *Larson*, 456
U.S. at 248, 102 S. Ct. 1673 (holding that even
assuming *arguendo* that the government has a com-
pelling governmental interest for a denominational
preference, it must show that the rule is "closely fit-
ted to further the interest that it assertedly serves").
Because the facial preference for the Church of
Scientology embodied in the IRS's policy regarding
its members cannot be justified by a compelling gov-
ernmental interest, we would, if required to decide
the case on the ground urged by the Sklars, first
determine that the IRS policy constitutes an uncon-

stitutional denominational preference under *Larson*, 456 U.S. at 230, 102 S. Ct. 1673.

282 F.3d at 618-19 (footnote omitted). However, the *Sklar I* panel declined to follow the Sklars' suggestion that they, too, are entitled to an unconstitutional denominational preference for three reasons:

> First, we would be reluctant ever to presume that Congress or any agency of the government would intend that a general religious preference be adopted, by extension or otherwise, as such preferences raise the highly sensitive issue of state sponsorship of religion. In the absence of a clear expression of such intent, we would be unlikely to consider extending a policy favoring one religion where the effect of our action would be to create a policy favoring all. Second, the Supreme Court has previously stated that a policy such as the Sklars wish us to create would be of questionable constitutional validity under *Lemon*, because the administration of the policy could require excessive government entanglement with religion. *Hernandez*, 490 U.S. at 694, 109 S. Ct. 2136; *see Lemon*, 403 U.S. at 612-13, 91 S. Ct. 2105. Third, the policy the Sklars seek would appear to violate section § 170. *See Hernandez*, 490 U.S. at 692-93, 109 S. Ct. 2136.

*Id.* at 619-20.

The *Sklar I* panel also rejected the Sklars' administrative inconsistency claim on two grounds:

> First, in order to make an administrative inconsistency claim, a party must show that it is similarly situated to the group being treated differently by the agency. *United States v. Kaiser*, 363 U.S. 299, 308 [(1960)]. We seriously doubt that the Sklars are sim-

ilarly situated to the persons who benefit from the Scientology closing agreement because the religious education of the Sklars' children does not appear to be similar to the "auditing", "training" or other "qualified religious services" conducted by the Church of Scientology. Second, even if they were so situated, because the treatment they seek is of questionable statutory and constitutional validity under § 170 of the IRC, under *Lemon*, and under *Hernandez*, we would not hold that the unlawful policy set forth in the closing agreement must be extended to all religious organizations.

*Id.* at 620 (citation omitted).

**[12]** These principles are as correct today as they were six years ago. We adopt the full force of the conclusions they dictate. To conclude otherwise would be tantamount to rewriting the Tax Code, disregarding Supreme Court precedent, only to reach a conclusion directly at odds with the Establishment Clause—all in the name of the Establishment Clause. The principle the Sklars advance does not stop with them and their 1995 taxes; its logic would extend to all members of religious organizations who benefit from educational services that are in whole or part religious in nature. The Tax Court correctly held that neither the Establishment Clause nor principles of administrative consistency allow the Sklars the deductions they seek, and the Tax Court's denial of discovery regarding the Closing Agreement in proceedings involving the deductibility of the Sklars' tuition and fees was not an abuse of discretion.

## CONCLUSION

The Tax Court correctly affirmed the IRS's disallowance of deductions the Sklars claimed for tuition and fees paid to their children's Orthodox Jewish day schools. The decision of the Tax Court is **AFFIRMED**.